Objection to Class Action Settlement

Case: "Griffith, et al. v. Providence Health & Services, et al., case No. 14-cv-01720-JCC;"

Filed: 2/21/2017

Name: Patrick C. Petersen, 9630 315th Ave SE, Issaquah, WA 98027

Phone #s' 206-355-4974 & 206-935-22390

_____ FILED          _____ ENTERED
_____ LODGED      _____ RECEIVED

FEB 21 2017          DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                          DEPUTY

I object to the settlement because Group I should be divided into two separate groups.

Group 1-A   Being beneficiaries that are retired and have not had their accrued benefits reduced by PH&S. These people want PH&S to provide enough funding to meet ERISA standards and that they will get retirement plan benefits taken care of without a shortfall in funding. Similar to what is stated in the settlement agreement.

Group 1-B  Those beneficiaries that have continue to work at PH&S. These people have had their contracted accrued benefits reduced by PH&S after the 2009/2010 retirement plan changes illegally done by PH&S.

#1.  Providence from previously filed case documents with the IRS that deny rights of being: "church, association of churches and convention of churches". Therefore PH&S cannot claim its retirement plans are "Church Plans". PH&S retirement plans must be ERISA retirement plans from 2006 onward.

#2 The Plaintiff has filed documents and has stated supported with other documents with the Court numerous reasons why PH&S does not qualify as a:"Church Plan.".

#3.  PH&S-Retirement Plan Committee(RPC) interchangeable usage of Plans, Amendments and back to plans again shows using the law as a pick and choose to PH&S needs.  Records of RPC minutes show the 2009/2010 retirement plan changes crossed several legal boundaries. I believe that PH&S failed in not correctly terminating the Cash Balance Fund and restarting a new Cash Balance fund. An amendment change to the Cash Balance fund I believe is illegal by IRS regulations. This nullifies the 2009/2010 plan changes.

#4.  PH&S retirement plans having failed the "Church Plans" requirements must be consider ERISA Plans. Thus PH&S plans fail disclosure requirements, accrued benefits protections and fiduciary duties. A reduction in accrued retirement benefits I believe can only be done by the Federal Bankruptcy Court. PH&S reduce accrued benefits without any legal standing.

5#.  PH&S must reinstate previous accrued "Core Plan"/Cash Balance Fund earnings on Group 1-B. Group 1-A has not had any reduction in benefits. The accumulated cost of this accrued earnings shortfall amounts to over  $200 per thousand dollars of accrued benefits from 2009 to date.

6#. PH&S must also increase its capital funding in its Cash Balance fund to sustain the additional earnings from the illegal reduction of accrued earnings benefits.

7#. PH&S failed in its fiduciary duties in protecting the retirement plan beneficiaries. The enclosed Arbitration testimony of Thomas McDonagh of PH&S systems director of retirement shows that Mr. McDonagh was more interested in saving PH&S money helping the Beneficiaries of the various plans.

7a#. RPC minutes support several times Mr. McDonagh was counsel on retirement plan legalities and his fiduciary duties. He failed in protecting his beneficiaries' retirement benefits. Most pointedly Mr. McDonagh pointed out that unfunded liabilities and PH&S borrowing ability were his priorities. Financial notes support his position with a write down of liabilities of nearly $100 million dollars. Mr. McDonagh never showed an interested in protecting beneficiaries.

I want to testify at this settlement meeting about these objections.

Patrick C. Petersen

9630 315th Ave SE

Issaquah, WA 98027

Phone 206-355-4974

Phone 206-935-2390

*Patrick C. Petersen*
*2/24/17*

IN ARBITRATION
Frederick P. Kessler

---

In the Matter of a Grievance Arbitration )
Between:                                  )
                                          )
                                          )
The International Union of Operating      )
Engineers, Local 286,                     )
                                          )
            Union,                        )
                                          )
        And                               )
                                          )
PROVIDENCE MT. ST. VINCENT,               )
                                          )
            Employer,                     )
                                          )

---

ARBITRATION PROCEEDINGS

TESTIMONY OF THOMAS MCDONAGH

---

2:52 p.m.
April 26, 2011
19621 International Boulevard
Seattle, Washington

Zoya O. Spencer, Court Reporter
CCR #2418

APPEARANCES


THE ARBITRATOR:        FREDERICK P. KESSLER
                       Labor Arbitrator
                       11211 W. Sanctuary Drive
                       Milwaukee, Wisconsin 53224
                       (414) 464-0951
                       Fkessler@execpc.com



FOR THE EMPLOYER, PROVIDENCE MT. ST. VINCENT:
                       PAULA L. LEHMANN
                       Attorney at Law
                       Davis Wright Tremaine
                       777 108th Avenue N.E., Suite 2300
                       Bellevue, Washington 98004
                       (425) 646-6100
                       PaulaLehmann@dwt.com



FOR THE UNION, IUOE LOCAL 286:
                       TERRY ROBERTS
                       DENISE COBDEN
                       Staff Attorneys
                       18 "E" Street S.W.
                       Auburn, Washington 98001
                       (253) 351-9095
                       Terry@iuoe286.org


ALSO PRESENT:

ED WEAVER, Union Witness
PAUL BOEHME, Union Witness, Providence MSV Shift Engineer
PATRICK PETERSEN, Union Witness, Providence MSV Shift
                Engineer
TOM MITCHELL, Administrator, Providence MSV
SYLVIA SERNA, HR Manager, Providence MSV

INDEX

EXAMINATION                                           PAGE

EMPLOYER WITNESS:

TOM MCDONAGH
          Direct by Ms. Lehmann              4
          Cross by Mr. Roberts              28
          Redirect by Ms. Lehmann          41
          Recross by Mr. Roberts           46

 Employer Exhibit 3, "Program Comparison Tool"
       marked @ page 21, admitted @ page 22

All other exhibits were either marked in previous
testimony or were pre-marked in The Union's Proffered
Exhibits binder

```
 1                    PROCEEDINGS

 2

 3                 THOMAS MCDONAGH,

 4             Witness herein, having been

 5             duly sworn, testified as follows:

 6

 7          THE ARBITRATOR:   State your name.

 8          THE WITNESS:  Thomas McDonagh.

 9          THE ARBITRATOR:   M C D --

10          THE WITNESS:  O N A G H.

11          THE ARBITRATOR:   Okay.   Proceed.

12

13                 DIRECT EXAMINATION

14   BY MS. LEHMANN:

15      Q.   Can you summarize, please, for the Arbitrator your

16   educational background.

17      A.   I have degrees in economics and finance, I am

18   certified by employee benefits, by human resources, and I'm

19   a level 1 chartered analyst.

20      Q.   And are you presently employed by Providence?

21      A.   I am.  I've been employed for 15 years by

22   Providence.

23      Q.   What's your position there?

24      A.   I am the system director for retirements, HR

25   analytics, HR operations, occupational health and safety,
```

1 workers comp.

2     Q.    And are you employed by Providence Health and

3 Services?

4     A.    I am.

5     Q.    And you've had that same position for the last 15

6 years?

7     A.    Correct.

8     Q.    And --

9     A.    Well, I'll correct it.  There have been some

10 add-ons, but I've held the retirement portion for the last

11 15 years.

12     Q.    Okay.  When you arrived 15 years ago, was the

13 retirement plan mentioned in, I believe it's Joint

14 Exhibit 22, Article 14 -- let's look at the page.  I

15 believe it's page 10 of Joint Exhibit 22.

16     A.    Under Article 14?

17     Q.    Right.

18     A.    I have never heard of this plan.

19     Q.    What plan was in effect when you came to

20 Providence in -- 15 years ago?

21     A.    The retirement plan for employees was the active

22 pension plan at that time.

23     Q.    What was it called or how was it referred to?

24     A.    Well, the technical name was The Providence

25 Retirement Plan For Employees, but the employees called it

1    "The Retirement Plan."

2        Q.    And what employees were eligible for that

3    retirement plan?

4        A.    I would say with a few exceptions, all employees

5    were eligible; i.e., if you were a vowed religious, you

6    were excluded from the profit sharing -- from the pension

7    plan; if you were a leased employee, you were excluded.

8    And there were a few others that I would have to look at

9    to --

10       Q.    But in essence most of the employees?

11       A.    All, I mean with those few exceptions.

12       Q.    And Mr. Roberts made a reference to some states.

13   What states would that cover and what's the general number

14   of employees you would be talking about?

15            THE ARBITRATOR:    I'll just take a note that in

16       the Exhibit 11 there were all the states that were

17       there:  Alaska, Montana, California and everything in

18       between.

19       A.    Alaska, California, Oregon --

20            THE ARBITRATOR:    That's in between.

21            THE WITNESS:  And you had Montana?

22            THE ARBITRATOR:    I did.  I said Montana,

23       California, Alaska and everything in between.

24            THE WITNESS:  Perfect.

25       Q.    What was the approximate number of employees?

1     A.    Then or --

2     Q.    Then, 15 years ago.

3     A.    I'm going to say it was about 27 to 29,000,

4 somewhere in there.

5     Q.    What role did you have as system director of

6 retirement with regard to collective bargaining in any

7 particular ministry?

8     A.    None.

9     Q.    Were you sometimes consulted about contract

10 language?

11    A.    On rare occasion.

12    Q.    Do you remember any consult from 2005 --

13    A.    No.

14    Q.    -- for IUOE?

15    A.    No.

16    Q.    You don't recall that?

17    A.    (Witness shakes head.)

18    Q.    Have you at any point been consulted about whether

19 or not the employees in this bargaining unit could

20 participate in both the IUOE plan and the Providence plan?

21    A.    Yes.

22    Q.    Do you recall when that occurred?

23    A.    My recollection is that that occurred in a short

24 phone call and on e-mail in 2005ish.

25    Q.    What was your response to the inquiry and why?

1    A.    Because the plan has a provision that excludes

2    people that participate in other pension plans paid for by

3    the employer.  We do not participate in multi-employer

4    plans due to the exposure to the additional liability, and

5    there is no input from the employer's perspective on

6    outside pension plans.

7    Q.    There's been some discussion in this arbitration

8    about language, let's see, I think if you turn to Union

9    21 -- or Joint 21, excuse me, Article 14, which appears on

10   page 7.  This is the 2005-2008 agreement.

11         Looking at Article 14.1, you see the phrase "Tax

12   Deferred Annuity"?

13   A.    Correct.

14   Q.    What does that mean to you and does that

15   accurately described a plan at Providence?

16   A.    Tax deferred annuity implies that it's an

17   insurance product underwritten by an insurance company.

18   And no, it does not accurately reflect the 403(b) that

19   Providence has offered since 1995.

20   Q.    And what would be the appropriate name for that

21   plan that's been offered since 1995?

22   A.    Technically if you were going to go right out of

23   the site of the Internal Revenue Code, it would be

24   403(b)(7); but it's just 403(b), savings plan.

25   Q.    How is it referred to within Providence?

1     A.     We call it "The Value Plan" since 1997.

2           THE ARBITRATOR:     I'm just thinking, I think I'm

3     covered by a 403(b) when I was a judge, so that was the

4     reason why I'm looking at that.   I think government

5     employees are covered by --

6           THE WITNESS:   Government employees are covered by

7     a 457(b) and not a 403(b) -- a governmental 457(b).

8           THE ARBITRATOR:     All right.

9     Q.     And just as background too, Providence is a

10    non-profit religious organization, correct?

11    A.     Correct.

12    Q.     And the retirement plan that we're talking about

13    at issue in this arbitration, is that in ERISA or some

14    other?

15    A.     If we're talking about the value plan first.

16    Q.     Let's talk about the value plan.

17    A.     The value plan was a church plan up until January

18    1st, 2010, when it converted to an ERISA plan.

19          THE ARBITRATOR:     I'm just going to add a curious

20    question.

21          MS. LEHMANN:   Sure.

22          THE ARBITRATOR:     I'm in some funds that are

23    called value funds, but that has a very different

24    meaning from what I'm hearing this --

25          THE WITNESS:   Yes, correct.

1        THE ARBITRATOR:    -- for some stocks and bond

2     funding, mutual funding.  So this is not a value fund

3     as defined by general --

4        THE WITNESS:  If I may explain --

5        THE ARBITRATOR:   Yes, just out of curiosity.

6        THE WITNESS:   -- Your Honor?

7        So the answer is back when we made a change in the

8     late '90s, we renamed the pension plan and the 403(b)

9     to be called "Core" and "The Value Plan" because at

10    Providence we have core values.

11       THE ARBITRATOR:  Okay.

12       THE WITNESS:  So it's a play on core values.

13       So did you want the retirement plan too then?

14    Q.    Sure.

15    A.    So the retirement plan is and continues to be a

16    church plan, not an ERISA plan.

17    Q.    Thank you.  Were there modifications to the

18    retirement plans over the last 15 years?  Can you summarize

19    for the Arbitrator what some of those modifications were?

20    A.    Sure.  The answer is yes, in the last 15 years we

21    converted from a traditional pension plan to a hybrid cash

22    balance plan which is not a defined benefit plan, it's not

23    a defined contribution plan, it's kind of both.

24       We froze or eliminated the Rule of 85 provision

25    1-1 of '07.  We have added protection of declining lump sum

1    benefits for people who retire but leave their money in the

2    plan so that their annuity value doesn't decline.  We've

3    made a number of different provisions, changes over the

4    years.

5         Q.   To the best of your knowledge, has IUOE arbitrated

6    any of those changes over the years?

7         A.   I've never been informed of any concern.

8         Q.   And turning to the modifications that were

9    anticipated modifications identified in April of 2009, can

10   you summarize for the Arbitrator what those modifications

11   were proposed to be?

12              And I know that's a lot and if you would like to

13   go through what we call the deck, we can do that, that's

14   been marked an exhibit already.

15        A.   That's Exhibit 11?

16        Q.   11.  Or if you can just summarize for the

17   Arbitrator what you were attempting to accomplish with

18   those modifications.

19        A.   Okay, I'll start with the Core Plan or the pension

20   plan as it's been referred to today.

21              In 2007, there was a regulation change called

22   FAS 158 issued by FASB, the Financial Accounting Standards

23   Board, that required organizations, both tax exempt and

24   for-profit, to begin including the unfunded liability or

25   the excess on their P & L statement or on their balance

1  sheet.

2         That went into effect in 2008.  And that had the

3  impact -- before, it was just a footnote in the financials,

4  you just had to make a mention of where your pension was.

5  Now, you have to include it on your profit and loss

6  statement if you're for-profit, and your balance sheet if

7  you're tax exempt.

8         That regulatory change meant that Providence would

9  have had to recognize $750 million, I'm rounding, so

10  probably 746 at the time, on the balance sheet.

11  Recognizing that money on the balance sheet meant that we

12  would reduce our ability to raise capital, because as a tax

13  exempt organization we don't have shares, we issue bonds.

14  And that would have reduced the bond issuance capability by

15  almost $300 million.  That would have suppressed our

16  mission and our viability substantially.

17         So the change to the pension is a result of that

18  regulatory change.  Did you want --

19  Q.    No -- I was going to ask you why it needed to be

20  changed, you've answered that.

21         And then how was -- or what modifications were

22  needed in order to address the issues raised by the

23  regulatory change to FAS 158?

24  A.    So future benefit accruals, the annual benefit

25  that people would receive, was frozen; there would be no

1   more added to that account.  However, if you have what was

2   known then as a cash balance account, you would get

3   interest crediting.  The interest crediting rate was

4   modified from CPI plus 3 to CPI plus 1 capped at 4 percent;

5   however, it was not changed for anyone who had met the Rule

6   of 85 at the time of the change.

7          So it was preserved for anyone who met the Rule of

8   85, which is an early retirement enhancement age and

9   service add together; if they equal 85, then you were

10  allowed to keep CPI plus 3; anyone less than that had CPI

11  plus 1.  Those were the two changes to what we call the

12  Core Plan.

13      Q.    Now there's been some testimony about the value

14  plan.  Can you explain what if any modifications that were

15  associated with the value plan?

16      A.    In terms of the 2009 changes?

17      Q.    Right, what you were talking about with --

18      A.    With the deck in Exhibit 11.  Okay, so the changes

19  to the value plan were:  We modified the mutual fund

20  offerings.  We did offer over 186, we lowered that number.

21  And then we added a mutual fund window where Providence

22  covered all expenses of the window.  The employee did not

23  pay to use the window, nor did Fidelity get any fees -- our

24  administrator get any fees to process anything through the

25  window.  However, if you were buying Sally Brown ABC fund

1  and that had a 5 percent commission or front-end load, the

2  employee does pay that.  But there is no commission or

3  front-end load on any of the funds that we offered prior to

4  the change; so if they really wanted to keep Fidelity

5  Select Timber Fund, they could at no cost to them.

6       Q.   So was the value plan modified in any way that

7  impacted the 11 IUOE members that you're aware of?

8       A.   Not that I'm aware of, no.

9       Q.   Turning then to the document that's been marked

10  Union 12, if you have that open.

11       A.   Getting there.

12       Q.   Skipping over the e-mail and just looking at the

13  substance, did you have a hand in the preparation of these

14  materials?

15       A.   I did.

16       Q.   Can you explain --

17       A.   I'll correct you.  The first two pages I did not,

18  but the remaining pages I did.

19       Q.   Okay.  So the first page is a summary, is it fair

20  to say, of what the remaining pages show?  Not -- I'm

21  sorry, not the e-mail.

22       A.   The second page of the section?

23       Q.   The second page that looks like a comparison

24  chart.

25       A.   Yes, this is a summary of the results contained on

1    the individual pages.

2         Q.    Can you explain to the Arbitrator what those

3    individual pages reflect?

4         A.    Sure.  These are retirement program projections.

5    The left side, called "Current Retirement Program," says,

6    if the current retirement program -- because we're talking

7    about in 2009 -- continued, you might expect something like

8    this based on the assumptions above.

9              And the right side says this is the new retirement

10   program, and this is something that you might expect under

11   the new program given the assumptions above.

12             And in the final column, the change in the total

13   represents what the new program is expected to replace from

14   the old program.

15        Q.    These are then projections?

16        A.    Just projections.  They're estimates, they're not

17   based on actual information.  For instance, the

18   compensation used in these projections was 2008's

19   compensation increased at 3 percent salary for 2009, and

20   then increased at 3 percent again in 2009 for 2010.  These

21   numbers would be different if we used 2010.

22        Q.    What was the purpose in preparing these projection

23   sheets?

24        A.    This was to give employees a conservative idea as

25   to the relative impact of the program change.  And they

1    could go online and create these themselves using whatever

2    set of assumptions they wanted.

3        Q.    And how would they go -- what would they use?

4        A.    They would go on the Road-2-Retirement website,

5    log in as themselves.  If they don't have a log-in, it's a

6    two-minute process to get a log-in, and then perform the

7    projection themselves using their own assumptions.

8        Q.    Turning to the summary sheet --

9        THE ARBITRATOR:    Let me ask a question while

10    you're on that.  You have the cap at 4 percent?

11        THE WITNESS:  Yes.

12        THE ARBITRATOR:    Now I noticed just in a

13    quarterly statement I got on a thing, a 5.8 increase

14    for a quarterly value of some mutual funds.  What

15    happens if the mutual fund or the investment exceeds

16    the 4 percent?

17        THE WITNESS:  We don't look at individual plan,

18    Your Honor, we look at the program.  So the percentage

19    change that you saw from one quarter to the other, 5.8

20    percent, it's not the return of those mutual funds;

21    that's the aggregate of how your investments performed

22    for that quarter.

23        THE ARBITRATOR:    That's correct.

24        THE WITNESS:  So we're looking at retirement,

25    which is age 65.  So we're not looking at an individual

1    quarter or an individual year or two; we're looking at

2    what does it looking like at retirement.

3         THE ARBITRATOR:   Based on an assumption of --

4         THE WITNESS:  Correct.

5         THE ARBITRATOR:   But if the assumption -- if the

6    stock market increases at a faster rate, what happens

7    to the excess there?

8         THE WITNESS:  The CPI plus 1 would stay the same.

9    However, we have a replacement plan that is

10   self-directed, and so you would see those returns in

11   that replacement plan.

12        If you -- like you said you saw 5.8 percent, they

13   might see 5.8 or 10 percent as a return.  But the Core

14   Plan has always been communicated as a fixed income

15   piece which you're not expected to get an equity return

16   on.

17        THE ARBITRATOR:   I understand.

18   Q.    Turning to the comparison chart.  Based on the

19   projections that were done in October of 2009 which would

20   be page 2 of Exhibit 12, are there some employees who are

21   doing over 100 percent what they would have been projected

22   under the former plan?

23   A.    Correct.

24   Q.    And what are some factors that would cause that to

25   happen?

1    A.   Their current age, their compensation, their years

2   of service.  It's very individualized calculations.

3    Q.   Can you describe for the Arbitrator what

4   transition benefit was available to eligible employees?

5    A.   Sure.  Transition benefit is meant to ensure that

6   eligible employees are on track to have at least a 90

7   percent replacement at age 65 ratio.  And so whether they

8   changed positions or not or their salary increased or

9   whatever, they would still get that transition benefit for

10   as long as they worked.  So even though we're only looking

11   at age 65, if you stayed until 70, you would get it until

12   70.

13    Q.   What were the criteria in order to receive that

14   transition benefit?

15    A.   The transition benefit was made available to

16   employees with ten or more years of service at the end of

17   2009 and employees that had income over the Social Security

18   wage base.

19    Q.   Did they need to be in the modified retirement

20   plan by a certain date in order to be eligible for that

21   transition benefit?

22    A.   Yes, 12-31 of '09 we took a snapshot of who was in

23   the plan.

24    Q.   And did the employees in IUOE migrate to the plan

25   on 12-31-09?

1     A.    That's my understanding, yes.

2     Q.    Were there or are there employees within IUOE who

3 were eligible for the transition benefit who would

4 otherwise have lost it if migration had not occurred on

5 that date?

6     A.    Yes.

7     Q.    You've heard some testimony from Mr. Boehme

8 regarding his benefit sheet here.

9     A.    Uh-huh.

10    Q.    Did he make some statements with which you

11 disagree regarding how he understood this sheet?

12    A.    Yes.

13    Q.    Could you tell the Arbitrator what those

14 misunderstandings might have been?

15    A.    Sure.  We present your account as a lump sum

16 balance, but Mr. Boehme's benefit is coming from the

17 protected benefit which is a monthly annuity.  And that

18 monthly annuity is not changing and has not changed, nor

19 will it change.  So as he ages, that monthly annuity will

20 increase.  However, when you convert to the lump sum

21 present value, that annuity value can fluctuate.  But the

22 annuity itself, the value of the annuity, if it's $300 a

23 month payable for life, that 300 doesn't change.  But if I

24 were to pay it as a lump sum, this year it might be worth

25 131,000, next year it might be worth 135,000, the year

1  after it might be worth 128,000. And that's a factor of

2  actuarial tables and Mr. Boehme's life expectancy, but the

3  benefit that's being presented has not changed.

4      Q.    And that's true with the modifications, in other

5  words, the benefit you're talking about was the same prior

6  to modification of the plan?

7      A.    Correct.

8      Q.    So there was no change to Mr. Boehme as he

9  describes it?

10      A.    Not to my knowledge.

11      Q.    What about the spousal benefit that he testified

12  to being reduced, was that accurate?

13      A.    Not necessarily. Because if his monthly annuity

14  hasn't changed, then his spousal benefit is based on the

15  monthly benefit, so no.

16      Q.    Could Mr. Boehme have contacted the system

17  retirement office and received clarification if he chose?

18      A.    Absolutely.

19      Q.    When you call that number, who do you talk to?

20      A.    It's a toll free number staffed Monday through

21  Friday, 8:00 a.m. to 5:00 p.m., and you would talk to one

22  of our service team representatives.

23      Q.    Did the system retirement office bring resources

24  out to The Mount to help employees understand the

25  individual impact of the proposed modifications?

1    A.    Yes, we did.

2    Q.    Prior to coming here today, did I ask you to

3    update the projections that had been run from October of

4    2009?

5    A.    Yes.

6    Q.    Let me hand you a document and ask you if you

7    recognize it.  We'll have these marked as Employer 3.

8    These were provided to Mr. Roberts prior to the hearing.

9          (Employer Exhibit No. 3 marked.)

10         MR. ROBERTS:  We'll state our objection right now.

11    The employer failed to give this document to us until

12    yesterday, thus precluding us any opportunity for any

13    meaningful evaluation of the content of this document.

14         THE ARBITRATOR:   Do you want to respond?

15         MS. LEHMANN:  We did run these on Friday.  I

16    explained to Mr. Roberts that I was not able to get

17    into the office on Friday to scan them, but I did send

18    them to him on Monday.

19         You will note that the same methodology applies to

20    the sheets he's had since October of 2009 as here.  The

21    witness can explain what the difference is in terms of

22    actual numbers versus estimated numbers that were used,

23    but the methodology did not change.

24         THE ARBITRATOR:   I am going to receive them into

25    evidence.  Certainly if in the brief you end up finding

1    some calculable error, that can be pointed out.

2    (Employer Exhibit No. 3 admitted.)

3    MR. ROBERTS:  Okay.

4    THE ARBITRATOR:  And of course you can respond if

5    there was the calculable error that was discovered.

6    But it appeared to me that this is literally identical

7    to those in 12 except for a later date.

8    But at this point I do not have the date that was

9    used to calculate these.

10    MS. LEHMANN:  May I ask the witness?

11    THE ARBITRATOR:  Sure.  I guess I'd like to know

12    what that date is.  The other one was October 28, 2009.

13    THE WITNESS:  4-21-2011, down at the bottom.

14    THE ARBITRATOR:  So that was the date of the

15    calculation, that's the date of the printing.

16    THE WITNESS:  That was the date we performed the

17    calculation and printed them, yes.

18    Q.  What's the difference between the sheets that were

19    run -- actually I think the date down there was 10-26-09

20    but presented to the union on the 28th.

21    What was the difference between those sheets that

22    are part of Union 12 and what's been identified as

23    Employer 3?

24    MS. LEHMANN:  And I believe these have been

25    admitted into evidence then?

1          THE ARBITRATOR:   Yes, they are received.

2     A.    The only difference is that we used actual

3     compensation.  Under the right side, "Your Assumptions for

4     New Program," the only change is the estimated compensation

5     that was used has been change to the actual compensation

6     that the employee earned for that year.

7     Q.    Turning to the sheet for Mr. Petersen, I think

8     it's the tenth page in.

9     A.    Yep.

10    Q.    It looks like under the new program and under

11    these numbers using actual numbers, that he is at 104.35

12    percent of what he was projected to have under the old

13    plan; is that right?

14    A.    Correct.

15    Q.    And how do you account for the difference in the

16    projection from 2009 to 2011?

17          THE ARBITRATOR:   Have we got an extra copy?  I

18       think Mr. Petersen ought to have one.

19          MR. PETERSEN:  I'm kind of lost here.

20          THE ARBITRATOR:   Yes, I think he ought to be able

21       to look at it too if he can.

22          MS. LEHMANN:  Sure.  I did give it electronically

23       to Terry.  I don't know --

24          THE ARBITRATOR:   All right.  You can use my copy

25       while she's asking.

1    MR. ROBERTS:  That's all right, he can look at my

2     copy.

3         (Document handed to Mr. Petersen.)

4    A.    The difference here being Mr. Petersen, we used

5    his actual compensation; and in the assumption provided in

6    October of 2009 was a different compensation number.

7    Q.    So the estimated salary used in 2009 was less than

8    the actual earnings?

9    A.    Correct.

10   Q.    And that accounts for the difference?

11   A.    And in October -- I can't tell you if the

12   transition benefit is factored into the October '09, but it

13   would be if he was eligible factored into this.  Given his

14   years of service, he is not eligible for the transition

15   benefit.

16   Q.    And would the other differences that we see in

17   these projects be attributable to the same difference, that

18   is, actual salary versus estimated?

19   A.    Yes.

20        MS. LEHMANN:  I just want to be sure we move that

21     those be admitted into evidence as Employer 3.

22        THE ARBITRATOR:  Any objections?

23        MR. ROBERTS:  Yes, I continue to objection.

24        THE ARBITRATOR:  I will overrule your objection.

25     We'll note it again.

1          MR. ROBERTS:  They're admitted as Exhibit No. --

2          MS. LEHMANN:  Employer 3.

3          THE ARBITRATOR:    Further questions?

4          MS. LEHMANN:  Yes.

5     Q.    You've heard the testimony regarding the

6     announcement of the anticipated retirement changes in April

7     of 2009, correct?

8     A.    Correct.

9     Q.    What was happening with the retirement plan

10    modifications between April of 2009 and implementation in

11    January of 2010?

12    A.    Continued analysis, constant analysis, additional

13    changes; things come to light that you need to make changes

14    to; and communication was being built, education was being

15    built, et cetera.

16    Q.    Did these modifications need to be approved by the

17    Providence board?

18    A.    Yes.

19    Q.    And when were they approved by the Providence

20    board?

21    A.    I'm not sure of the exact date, but it was either

22    December of '09 or late November of '09.

23    Q.    After the announcement of the anticipated change;

24    is that fair to say?

25    A.    Yes.

1    Q.    Were there contingencies in place in the event
2   bargaining was required for these changes and for whatever
3   reason a local ministry didn't bargain those changes or
4   decided not to implement those changes in the retirement
5   plan, how would that work?
6    A.    Yes, there were contingencies for collectively
7   bargained employees.  And the way it worked is the cost of
8   the ongoing plan would be paid for by the ministry, the
9   local ministry, and the representatives at the local
10  ministry would work over the course of the next whatever to
11  negotiate the new program.
12   Q.    Turning to what's been marked as Union 13, this is
13  the sheet prepared by Mr. Petersen.  Could you provide the
14  Arbitrator with your comment on the methodology here and
15  its accuracy with regard to projecting differences between
16  the modified plan?
17   A.    I wouldn't classify this as a projection; I would
18  classify this as a snapshot, a current view.  If you're
19  looking at a new hire, a projection would be at retirement
20  age, not one or two years.  And if you're looking at
21  retirement age for a new employee, the replacement ratio is
22  going to be over a hundred percent.  The math is excluding
23  the match in the 403(b) value plan, which should be
24  included, because we look at the retirement program, not at
25  the retirement plan known as Core Plan.  And so if I were

1  doing this, I would do it much differently, because a

2  retirement program is not a one year benefit.

3      Q.   In the 15 years that you've been working at

4  Providence, have you reviewed for retirement plans on any

5  kind of a regular basis?

6      A.   Every day.  We look at it every day.

7      Q.   I just want to be sure I've given you an

8  opportunity to comment on the criticisms or comments raised

9  by Mr. Boehme and Mr. Petersen.  Were there any other

10 thoughts you had with regard to their testimony that was

11 not already covered?

12     A.   No, I wouldn't say criticism of their testimony; I

13 would say that it's not as well informed as it should be to

14 make the assessments that they did.

15     MS. LEHMANN:   Thank you.  We don't have further

16 questions.  Thank you.

17     THE ARBITRATOR:   Cross examination.  Do you need

18 some time before you do?

19     MR. ROBERTS:  Yes.

20     THE ARBITRATOR:   We'll take five.

21     (A brief recess was taken.)

22     THE ARBITRATOR:   All right, we'll have you take

23 the stand again and we'll have cross examination.

24

25

CROSS EXAMINATION

BY MR. ROBERTS:

Q.   I would just like to get some clarification of your testimony that you've offered.  Your office is at the Renton complex of Providence?

A.   Correct.

Q.   And in terms of context type questions to assist the Arbitrator, this retirement change that we're talking about, it affected about 50,000 employees, correct?

A.   Full time equivalents is probably around 45, 46. So if you want to round, I'm good with that.

Q.   Okay, whatever you're most comfortable with.

A.   Yeah.

Q.   Okay.  In several states?

A.   Correct.

Q.   And it involved union and non-union settings?

A.   What did?

Q.   The changes.

A.   The changes involved represented and non-represented employees?

Q.   Correct.

A.   Yes.

Q.   And the changes were made at times that Providence had the labor agreements open for negotiations and some labor agreements were closed?

 1      A.    That part I have no idea of.

 2      Q.    Okay, that's fine.  And all of the changes became

 3  effective January 1 of 2010?

 4      A.    Correct.

 5      Q.    But there were a lot of things that needed to be

 6  done before January of 2010, correct?

 7      A.    Things being just --

 8            MS. LEHMANN:   Objection, the question is vague

 9      and ambiguous.

10            THE ARBITRATOR:   I'll sustain that.  Be more

11      specific of what needed to be done.

12            MR. ROBERTS:  Okay.

13      Q.    The changes that were made to the retirement plan

14  involved -- my first question is going to be this --

15  involved a great deal of work, I presume, from you?

16      A.    I was involved in the work, yes.

17      Q.    Okay.  When did you first start working on those

18  changes?

19      A.    15 years ago.

20      Q.    And the board of directors approved the change

21  when?

22            MS. LEHMANN:   I was just going to object.  The

23      question again is vague and ambiguous.

24            THE ARBITRATOR:   I assume we're talking about the

25      change to which of the plans?  That probably would

1          clarify.

2               MS. LEHMANN:   Yes, if you could.

3               MR. ROBERTS:  The changes to the retirement plan?

4               THE ARBITRATOR:   What you referred to as

5          retirement.

6      A.    Changes, we've changed the plan every year since

7  I've been here.  So are we still talking about --

8               THE ARBITRATOR:   The changes that are subject to

9          the grievance before us.

10      A.    And could you repeat the question now?

11      Q.    Yes.  They were approved by the board of directors

12  when?

13      A.    The end of 2009.

14      Q.    Okay.  Is there a human resource committee to the

15  board of directors?

16      A.    That is a subcommittee of the board of directors,

17  yes.

18      Q.    All right.  Is there a retirement plans committee

19  to the board of directors?

20      A.    There is.  It's a subcommittee also.

21      Q.    Do you sit on both those committees?

22      A.    I do not sit on them; I am a staff support.

23      Q.    The minutes of those meetings are published on

24  Providence's website?

25      A.    I don't know that.

1     Q.   Okay, that's fine.

2         In your direct examination, I thought there was a

3 reference to a regulation, a FASB or F A S B?

4     A.   FAS 158.

5     Q.   Yes.  Is that what you testified about?

6     A.   That's what I mentioned, yes.

7     Q.   Okay.  I'm very, very curious, were these changes

8 made as a result of changes to this regulation?

9     A.   These changes, just -- I'm really --

10     THE ARBITRATOR:  We're talking about the changes

11  in the grievance that we have --

12     THE WITNESS:  Just the grievance?

13     THE ARBITRATOR:  -- that's correct.

14     A.   Were they in response to the regulatory change?

15     Q.   Yes.

16     A.   Yes.

17     Q.   All right.  If you -- oh, this FASB 158 --

18     A.   FAS, no B, 158, issued by FASB.

19     Q.   Okay.  Well, let's kind of drill down a little bit

20 further.  What does FAS mean?

21     A.   Financial Accounting Standards.

22     Q.   Financial Accounting Standards.  Is that part of

23 ERISA?

24     A.   I have no idea.  I don't believe so, no.

25     Q.   You don't believe it is?

```
 1      A.    No.

 2      Q.    Okay.  Is this FAS accounting standard, is this a

 3   state statute standard?

 4      A.    I have no idea if it's in the Washington state,

 5   FAS is a federal standard.

 6      Q.    A federal.  Is it a federal regulatory agency?

 7      A.    I don't know if FASB is federal regulatory or not.

 8   I know that they issue regulations.

 9      Q.    All right.  Then I was -- I've never heard that

10   before, so I'm curious about that.

11      A.    Well, I think you heard it at the presentation in

12   October of 2009.  It's part of the deck.

13      Q.    I can assure you that I did not hear that at that

14   presentation.

15            I'm wondering --

16      A.    I can assure you that I said it.

17            THE ARBITRATOR:   I don't want to get into this

18    argument.

19            THE WITNESS:  It's okay.

20            THE ARBITRATOR:   All right.

21      Q.    If you'll be kind enough to look at Exhibit No. 8

22   which Ms. Lehmann questioned you about, my first foundation

23   type question is this:  Did you help Mr. Fletcher prepare

24   this letter dated April 7, 2009?

25      A.    I did not help Mr. Fletcher write this letter.
```

1    Q.   Did you look at that letter before it went out?

2    A.   I don't believe I did.

3    Q.   Okay.  Have you looked at it since?

4    A.   Not for two years.

5    Q.   Okay.  Would you know why Mr. Fletcher does not

6    say in his letter that the pension plan changes were made

7    as a result of the accounting standard?

8    A.   I have no clue.

9    Q.   If you would be kind enough to look at tab 14.

10   Have you ever seen that document before?

11   A.   No.

12   Q.   In my quick review of that document, Ms. Lehmann

13   doesn't make any reference to an accounting standard --

14        MS. LEHMANN:  Objection.  Mr. Arbitrator, the

15        letter will speak for itself.  Counsel's wasting time

16        asking witnesses to read what's already in the record

17        about which he knows nothing.

18        THE ARBITRATOR:   I think that's a preliminary

19        question and I think I'm going to overrule your

20        objection.  Is it correct that there's no reference to

21        the FAS standards, account standards?

22   Q.   Correct, and that is the preliminary foundation.

23   A.   I do not see it referenced in the letter.

24        THE ARBITRATOR:   Okay.

25   Q.   And then my question would be:  Can you tell us

1  why Ms. Lehmann does not --

2       THE ARBITRATOR:   That objection I'll sustain.

3       MS. LEHMANN:   Thank you.

4  Q.    You indicated in response to a question on direct

5  that there was a contingency in place to allow ministries

6  to continue the old pension, the old retirement plans; did

7  I understand that testimony to be --

8  A.    Do you want me to correct you, Counselor?

9  Q.    I do.

10  A.    Contingency plan in regard to the plan that's part

11  of the grievance, not in regard to the plans as in plural.

12  Are you with me?

13       THE ARBITRATOR:   I'm not.

14       THE WITNESS:  The grievance is only in regard to

15    one plan.

16       THE ARBITRATOR:   Right.  But I think --

17       THE WITNESS:  And he said "plans" and that would

18    be inappropriate.

19       THE ARBITRATOR:   I'm concerned about the fact

20    that I too felt that there was a situation where part

21    of the retirement plan that's the subject of this

22    grievance could continue for certain employees, or

23    former employees.

24       THE WITNESS:  Okay.  So the contingency question

25    was is there a contingency to allow them to continue

1    until it can be negotiated to participate into the

2    current plan.

3        THE ARBITRATOR:   I don't think that was the

4    question that I heard, but certainly that is not the

5    issue that concerned me on this.

6        THE WITNESS:  And that the local ministries would

7    be responsible for any additional costs associated with

8    the ongoing contingency.

9        THE ARBITRATOR:   I think I'm going to let

10   Mr. Roberts ask questions.

11       The question -- now that I see my notes, the

12   question I had is that future benefits would be frozen

13   except for those employees who were covered under the

14   Rule of 85, that was what I wrote down in my notes on

15   this.  And so you're saying that the FAS accounting

16   standards did not apply to people who were covered by

17   the Rule of 85?

18       THE WITNESS:  No, that's not what I said.

19       THE ARBITRATOR:   That's where I guess I have the

20   clarification that I'm confused at.

21       THE WITNESS:  Should I?

22       MS. LEHMANN:  May the witness clarify?

23       THE ARBITRATOR:   Sure.  I hate to interrupt and

24   ask questions, but that is a question that I'm

25   obviously misinterpreting.

1          THE WITNESS:  The freeze came about as a result of

2    FAS 158.  Employees have different benefits under the

3    program.

4          THE ARBITRATOR:  Right.

5          THE WITNESS:  There are some that have the

6    traditional pension plan, there are some that have a

7    different type of pension plan from different mergers

8    and acquisitions over the years.  So not everybody gets

9    an interest credit.  Some people just have a benefit

10   that as they age the actuarial reduction goes away,

11   right, that's a traditional pension plan.

12         And so when you look at these calculations, that

13   actuarial reduction is not factored into these

14   benefits.  So cash balance people get an interest

15   credit, pension people get an actuarial reduction as

16   they age.  In other words, they're not taking it early

17   anymore so I'm not going to reduce your benefit; you're

18   one year older, your benefit goes up.  Whether I did

19   anything or not, that's the way the actuarial tables

20   work.

21         So when I say frozen, I mean there will be no

22   additional benefit accrual under that plan under any of

23   those formulas.  But you will, if you're a cash balance

24   person, get an interest credit; and you will if you're

25   a pension person, a traditional pension person,

1    continue to see a benefit change based on the actuarial

2    reduction going away as you age.

3         THE ARBITRATOR:   All right.   Okay.

4         THE WITNESS:  Does that help?

5         THE ARBITRATOR:   I think so.  But I'll see if

6    Mr. Roberts has additional questions about that.

7    Q.   Well, we're going to spend some time on that.  But

8    first -- and focusing on Exhibit No. 3, Employer's

9    Exhibit No. 3.  I'll be very curious here on Exhibit No. 3.

10         Looking at Roger Amidon, the very first page.  I'm

11    interested in some bottom lines here.  So my question for

12    you is this:  Looking at Roger's age at 61, if you go all

13    the way across to the end, I see what appears to be a 98

14    percent, okay.

15    A.   Uh-huh.

16    Q.   Sir, would it be your testimony that as because of

17    these changes that are subject to the grievance, Roger is

18    now only going to get 98 percent of what he would have

19    gotten under the plans that were in effect before the

20    changes?

21    A.   Is that the question?

22    Q.   That's a question.

23    A.   The answer is no, I can't answer that.

24    Q.   Looking at the very last number, it's a 97.26.

25    A.   Uh-huh.

1     Q.   Does that reflect that he will get under the new

2 retirement plan only 97.26 percent of what he would have

3 gotten under the previous plans?

4     A.   It does not.

5     Q.   It does not.  Are these retirement plan

6 projections?

7     A.   Correct.  They're retirement program projections.

8     Q.   So it's possible, isn't it, that he would actually

9 get even less?

10     A.   It's possible he could get more.

11     Q.   Okay.

12     THE ARBITRATOR:  The question is:  Is it possible

13     he could get even less.

14     THE WITNESS:  It is.

15     THE ARBITRATOR:  Okay, thank you.

16     Q.   But if the changes had not been made, the numbers

17 in the first half of the box for Roger would have

18 continued, correct?

19     A.   No, they would not.

20     Q.   They would not?

21     A.   No.  These are projections as well.  It's possible

22 he could have less than that amount.

23     Q.   So would it be your testimony that these employees

24 that are the subject of this grievance have suffered no

25 harm as a result of the changes to the retirement plans?

1    A.   It would be my testimony that I have no idea as to

2  the harm because actual results will vary.  These are

3  projections meant to be conservative estimates, not

4  guarantees.

5    Q.   All right.  And Providence is conservatively

6  estimating that Roger will get 97 percent of what he would

7  have gotten under the old plans, correct?

8    A.   Based on the assumptions input, that's correct,

9  that's what the calculator is saying.

10    Q.   The retirement plans that are the subject of this

11  grievance, were they unfunded in 2008-2009?

12    A.   Unfunded?

13    Q.   Yes.

14    A.   The answer is no.

15    Q.   You mentioned in response to a question by

16  Ms. Lehmann that the testimony of Mr. Boehme and

17  Mr. Petersen was not as well informed as it should be?

18    A.   As it could be.

19    Q.   As it could be?

20    A.   Sure.

21    Q.   They didn't have access to all the records that

22  you had, correct?

23    A.   Incorrect.

24    Q.   They do have access?

25    A.   They can call the 800 number at any time and ask

1    any question and get a screen shot.  They can also go

2    online to R2R and inquire as to their benefits.

3        Q.    Okay.  And if the Arbitrator were to order as a

4    remedy to this grievance a reinstatement to the status quo,

5    that's feasible, correct?

6        A.    I can't answer that without looking at it, but --

7    I don't know.  I don't believe so.

8        Q.    You don't believe so.  But you don't know?

9        A.    I would have to look --

10       Q.    Okay.

11       A.    -- at the law.

12       Q.    I'm sorry, I didn't hear --

13       A.    I would have to look at the law.

14            THE ARBITRATOR:    "I would have to look at the

15        law," he said.

16       Q.    At the law.  Forget the law for a moment.  But it

17   would otherwise be feasible to reinstate to the status quo?

18            MS. LEHMANN:    Object to the form of the question.

19            THE ARBITRATOR:    I have to sustain that

20        objection.

21            MR. ROBERTS:    I don't have any further questions.

22            THE ARBITRATOR:    Redirect?

23            MS. LEHMANN:    Just briefly I think to get some

24        clarification around the questions the Arbitrator

25        asked.

REDIRECT EXAMINATION

BY MS. LEHMANN:

Q.   First, the modifications to the retirement plan were rendered effective 1-1-10, correct?

A.   Correct.

Q.   Would deposits into employees' accounts in 2010 be affected by those modifications?

A.   Deposits into --

Q.   I probably didn't ask that well.  The contributions are made in the spring of each year; is that correct?

A.   That's correct.

Q.   The contribution in the spring of 2010 would have been predicated under the former plan; is that right?

A.   Correct.

Q.   So that the difference would be, if any, would be in spring of 2011; is that correct?

A.   Correct.

Q.   Maybe if we just walk the Arbitrator through page 5 of the deck, that's the pyramid triangle.

A.   What exhibit?  I'm sorry.

THE ARBITRATOR:   11.

MS. LEHMANN:   Thank you.

Q.   It is a complicated concept, and to the extent we can clarify what those pyramids mean.

1    A.    Sure.

2    Q.    Can you explain to the Arbitrator what is in the

3    "Current" pyramid and what was reflected in the "New"?

4    A.    Sure.

5         THE ARBITRATOR:    I think you only have to confine

6         anything to the difference between the Core Plan, the

7         Frozen Core Plan and the 401(b) plan, and why that

8         change was made.

9         THE WITNESS:    If I can add one thing, Your Honor,

10        and that is the 457(b) that was mentioned earlier, it

11        is not a tax plan as mentioned, it is a pre-tax

12        deferral plan.

13   Q.    So looking at the Core Plan and the New 401(a)

14   Service Plan, the Frozen Core Plan, what was changed and

15   why?

16   A.    So Core Plan on the left under "Current"

17   represents what we've talked about, accruals occurring each

18   year based upon your service with the employer.  Whether

19   that was under a cash balance formula or one of the older

20   more traditional pension plan benefits, that says I'm going

21   to take your years of service, multiply them by a percent,

22   multiply them by your final average pay or your career

23   average pay and come up with a projected annuity at age 65.

24   Whatever was going under those formulas, that's what's

25   occurring here under this Core Plan, benefit accruals

1  occurring under those different scenarios.

2          Under the Frozen Core Plan, we stop those accruals

3  from occurring, those benefits accruals based on your

4  service, and now award you a benefit under the 401(a)

5  Service Plan, which is the name we gave the new replacement

6  plan, for the benefits that were accruing under the Core

7  Plan.

8          THE ARBITRATOR:   Okay.

9          THE WITNESS:  Does that help?

10         THE ARBITRATOR:   I believe that that does, but,

11    you know --

12         THE WITNESS:  Was that responsive?  I'm not sure.

13    Q.   Yes, that's responsive to what that change is.

14         So that under --

15         THE ARBITRATOR:   I guess if I have any question,

16    my only question comes in is the impact of the FAS 158

17    regulation on that, that only applies to -- that's the

18    reason you're contending that the Core Plan resulted in

19    it being frozen?

20         THE WITNESS:  FAS 158 required -- can I go into a

21    further explanation, is that all right?

22         THE ARBITRATOR:   That's up to the parties

23    whether --

24    Q.   Yes, I think it would be helpful to explain as

25  best you can.

1      A.    Part of FAS 158 also said you have to value your

2    benefits, your future liabilities.  And before, I didn't

3    have to say, well, you're a 21 year old employee, I don't

4    have to carry your benefit out to age 65 and value it at

5    age 65, your benefit is your benefit now at whatever age

6    you're at.

7          What this did was require us to now project out

8    the future liability for every employee which exponentially

9    grew the liability, that's true for all pension plans.  FAS

10    158 said then if there's a difference, a variance between

11    your market value of assets and that future liability, you

12    need to show that on your P & L or on your balance sheet.

13    And that variance is FAS 158, resultant of FAS 158.  And

14    that variance for us was 750 million approximately.

15          THE ARBITRATOR:   I understand all that.

16          THE WITNESS:  So I'm not sure what else to --

17        that's FAS 158's implication.  We cannot continue that

18        plan with FAS 158 because of the impact to the mission,

19        the reduction in bond offerings, which implies no more

20        new equipment, no new facilities, no remodels, no

21        anything, which impacts --

22          THE ARBITRATOR:   My impression is that was a $300

23        million impact on --

24          THE WITNESS:  Right, we're still paying the

25        difference between what it was and what it is.

1          Providence doesn't just get to say that whole 750's

2          gone, we still have to pay on the unfunded liability

3          that remains.

4              MS. LEHMANN:   If I may ask a question.

5      Q.    Had you not made the modification going to the 401

6   Service Plan -- first, by going to the 401(a) Service Plan,

7   does that FAS 158 apply to that type of plan?

8      A.    No, it does not.

9      Q.    All right.  So for the year that you're talking

10  about we had the 750 million unfunded liability --

11     A.    Yes.

12     Q.    -- you're paying that down now; is that right?

13     A.    That is correct.

14     Q.    But by moving to the 401(a), you didn't incur an

15  additional 750 million for that year and each year

16  thereafter?

17     A.    Each year subsequent, that's right.  It's not a

18  one-time look, it's an annual look, and it just grows.

19     Q.    So by moving effective 1-1-10, you were able to

20  put a stopper, if you will, on the unfunded liability you

21  were required to report under FAS 158?

22     A.    Correct.

23              MS. LEHMANN:   I hope that's helpful.

24              THE ARBITRATOR:   It may be helpful, but I'm not

25          really sure yet.  So maybe I'm going to have to listen

1    to that on the brief, that's the only problem that I'm

2    seeing.

3         MS. LEHMANN:   But from our perspective, I think

4    we've covered the testimony and we don't have further

5    redirect.

6

7                    RECROSS EXAMINATION

8    BY MR. ROBERTS:

9         Q.    I just want to be real clear about your

10   understanding of FAS 158.  There's nothing in FAS 158 that

11   specifically required you to change the terms of the

12   retirement plans, correct?

13        A.    Is there a provision within FAS 158 that says

14   Providence should change their retirement plan?

15        Q.    That said that Providence must change its

16   retirement plan.

17             THE ARBITRATOR:   Must.

18        A.    Must change, not that I'm aware of.

19        Q.    All right.  And if I understand what you're

20   saying, FAS 158 addresses the accounting of your retirement

21   plan?

22        A.    Yes, sure.

23        Q.    Okay.  And to comply with FAS 158 accounting

24   principles, you changed the retirement plan?

25        A.    Since the retirement plan is addressed by 158, you

1  would change based on the new accounting principle.

2        MR. ROBERTS:  No further questions.

3        THE ARBITRATOR:   Further questions?

4        MS. LEHMANN:   I don't.  But again I would invite,

5  if there is something that we've overlooked, because

6  sometimes you look at something too much and you miss

7  it, please feel free to ask --

8        THE ARBITRATOR:   I have to obviously contemplate

9  it and read in the briefs what the impact of its

10  entirety is.  And so I think I have a sense of what's

11  going on, but I'm probably going to have to have both

12  parties argue what that impact is on the core

13  retirement plan.

14        MS. LEHMANN:   So we would do that within our

15  post-hearing briefs.

16        THE ARBITRATOR:   Right.

17        THE WITNESS:  Your Honor, can I --

18        THE ARBITRATOR:   You can go.  No one -- you don't

19  have to stand up there while we're sitting here and

20  discussing.

21        MR. ROBERTS:  We would like the opportunity in

22  connection with this issue, which is a surprise to us,

23  this assertion that there's a connection between a

24  regulation and this change.

25        THE ARBITRATOR:   I'm sensing that there may be

1    some merit on your request, because frankly it catches

2    me a little bit by surprise too as I've listened to

3    this evolve that -- what's the impact of this

4    regulation.  You know, does it mean only that you can't

5    borrow any money, or does it mean that this has to be

6    something that really has an ultimate effect on the

7    pension?

8          And possibly if what I'm hearing you ask is you

9    may want an opportunity to have your own expert coming

10   in there telling you what FAS 158 means from their

11   perspective, it may moot the issue --

12         MR. ROBERTS:  Correct.

13         THE ARBITRATOR:   -- if what appears Mr. McDonagh

14   appears to be saying, it may moot their issue out and

15   their own expert may end up in total agreement with

16   that.  But I'm getting the impression that you didn't

17   really expect there was a regulation that played a

18   role.

19         MR. ROBERTS:  Never until today, that's correct.

20         MS. LEHMANN:   We obviously heard the witness

21   testify to the contrary.  But in any event, if

22   Mr. Roberts -- here's my argument on that.  I think

23   what's relevant here is the employer's understanding of

24   what its obligations were and why it did what it did,

25   which we've had all the testimony on that we could

1    muster.

2        THE ARBITRATOR:   Sure, that part, I understand.

3    What part where -- I have to say, as I listened to this

4    whole issue, you know -- and I hate to weigh in early

5    on something like this, but I think maybe I ought to

6    weigh in early on this, that on one hand what I'm

7    hearing sort of one point of view that says we had to

8    do this because FAS 158 was there, and this is a

9    regulation that occurred.

10        And I don't think that Mr. Roberts was aware of

11    that.  Because when I look at this, I don't think as

12    this evolved, I was aware of it until this thing

13    started to evolve --

14        MS. LEHMANN:   Of course, the parties haven't --

15        THE ARBITRATOR:   -- and first heard testimony of

16    the impact of FAS 158.  And I'm still not sure if I

17    entirely understand what the impact is.  Is the impact

18    that says, look, in order for us to be able to function

19    at the present level to increase or buy new equipment

20    or anything like this, we had do it; but if we just

21    wanted to continue the way we were, we didn't have to

22    do it.  That's the part that I don't understand.

23        And maybe what has to happen is that's correct,

24    but I do think Mr. Roberts ought to be able to have an

25    opportunity to have an expert of his choice look at

1    this.  I don't want to come back out here again for

2    this.  I mean I will if I have to.  I mean obviously

3    it's no big thrill come back and -- I have to tell you,

4    I already visited the food court at the big shopping

5    center on the other side of the interstate with such

6    regularity, because I'm out here probably three to four

7    times a year, and it's usually staying somewhere here

8    the night before I leave because the traffic is so bad,

9    if I stay up in Renton or stay where your office is,

10    that I'd never get here for my early morning flight.

11    So I usually tend to stay somewhere on International

12    Avenue, at this hotel, so I'm familiar with -- but what

13    I want to say is that part strikes me as still a little

14    bit of a gray area from my point of view.

15        MS. LEHMANN:  Let me suggest this.  I think the

16    transcript will clarify the question that you asked.  I

17    may have misheard what the witness testified to.  I

18    would suggest that the parties receive the transcript,

19    and then if Mr. Roberts thinks he needs an expert, that

20    we brief that and let you decide it with the actual

21    testimony for you.

22        THE ARBITRATOR:  Is that reasonable?  I think you

23    ought to be able to take Mr. McDonagh's testimony to an

24    expert.  And if they sit there and say no, he's

25    absolutely correct, they have no choice but because of

that talks about FAS 158. That's the first time really
that I focused on FAS 158 and any regulation that may
have had an impact that required changes. I don't even
think Mr. Petersen thought about the impact of 158 even
though he looked at this issue somewhat from his
background and skills.

MR. PETERSEN: You don't want me to comment, so --

THE ARBITRATOR: No. But what I think is -- can
you get his testimony first and just ship that to both
sides? And that you can probably do in seven, eight
days.

And then you can make a decision -- you can take
it over to somebody from -- the union expert. And then
you can make a decision on the degree that you might
want to challenge this and you can also look at that.

MS. LEHMANN: Sure, makes sense.

THE ARBITRATOR: That way you don't even have to
write a brief yet, if that's the case. And you still
may argue even without an expert on that of what the
impact is. But if you want an expert, then we can
decide do we want to do another additional hearing,
because I don't think I can expect you to take his
expert and go on an affidavit alone.

MS. LEHMANN: I would hope not.

THE ARBITRATOR: If we have to, we can do it

1    telephonic, I can stay in Wisconsin. There's all sorts

2    of other ways we can deal with that if we have to. But

3    the gist of it is my sense is I still feel I have to

4    give him a chance to do that.

5        MS. LEHMANN:   Sure.

6        THE ARBITRATOR:   Because I have to tell you,

7    that's the part that surprised me a little bit because

8    suddenly there was the argument that maybe this was

9    compelled by a regulation, and I don't think he thought

10   it was compelled by a regulation. And as I listened to

11   the testimony, until Mr. McDonagh talked about FAS 158,

12   that's the first time that the light flashed in my head

13   that this was an action that may have been mandated by

14   a regulation.

15       MS. LEHMANN:   Right.

16       THE ARBITRATOR:   And up to that point, I was

17   looking much more skeptically at the requirement of was

18   this required by a regulation. So if that helps a

19   little bit on how my viewing the testimony evolved over

20   here.

21       MS. LEHMANN:   It does. May I suggest that the

22   court reporter will have the seven to eight days to

23   prepare a transcript of his testimony, of

24   Mr. McDonagh's testimony --

25       THE ARBITRATOR:   Right, that's all I want.

1      MS. LEHMANN:   -- but that the union be given a

2   fixed time within which to sort of fish or cut bait so

3   we're not hanging indefinitely.

4      THE ARBITRATOR:  That sounds reasonable.

5      MS. LEHMANN:   What would be reasonable to you,

6   Terry?

7      THE ARBITRATOR:  I assume that somewhere in the

8   International there's some pension expert that you can

9   call.

10      MR. ROBERTS:  Yes, there is.

11      THE ARBITRATOR:  And if not, you can find somebody

12   at a high priced local cost or something, but you know,

13   whatever.

14      Seven days, 14 days, two weeks after that?

15      MR. ROBERTS:  To actually have the expert's

16   response or --

17      THE ARBITRATOR:   To make a decision on whether --

18      MS. LEHMANN:   That's fine.

19      THE ARBITRATOR:   I think you probably ought to

20   make a decision on whether you're going to go ahead and

21   ask for bringing in an expert.  She has seven days to

22   get you the transcript, you have another 14 days after

23   that to have somebody come in and say, now, this is the

24   correct understanding of the law or this is not.

25      MR. ROBERTS:  We will do that.  Give me 15 days to

1    identify, you know, who that person is --

2         MS. LEHMANN:    That's fine.

3         MR. ROBERTS:    -- what that person will say --

4         THE ARBITRATOR:    Sure.

5         MR. ROBERTS:    -- and those kinds of thing.

6         And I will also note that this is an area that I

7    will want also to examine Mr. Fletcher, the witness

8    that Ms. Lehmann did not make available today that you

9    had earlier indicated would be here.

10        THE ARBITRATOR:    I'm not going to open that up at

11   this point.

12        MS. LEHMANN:    Thank you.

13        THE ARBITRATOR:    I'm just going to open this up

14   onto the finding an expert that may rebut what

15   Mr. McDonagh has said about the impact of FAS 158,

16   because that was frankly what sort of sent flags up in

17   my mind as I was listening to this, so I'd just as soon

18   limit it to that point at this stage.    And at the end

19   of that time period, you can notify me if you're going

20   to go ahead, and then we can make a decision on how we

21   want to proceed on that.

22        MR. ROBERTS:    That sounds fair.    That sounds

23   reasonable.

24        MS. LEHMANN:    Yes, it does.

25        MR. ROBERTS:    If we can take just a two minute

1    break, we'll stand outside and see if there's anything
2    else that needs to be done.
3        THE ARBITRATOR:   We'll take a two minute break.
4        (A brief recess was taken.)
5        MR. ROBERTS:  Just one, and it's more of a
6    clarification, Paula.
7        On No. 7, Paula, the Providence stuff that's on
8    the Providence website, how did we decide that that
9    would -- we would deal with that?
10       THE ARBITRATOR:   You're going to have the last 11
11   pages.
12       MS. LEHMANN:  Yes.
13       THE ARBITRATOR:   That's what you decided.
14       MR. ROBERTS:  There we go.
15       MS. LEHMANN:  I thought we were also going to
16   confirm that that was complete.
17       THE ARBITRATOR:   You'll do that within -- you'll
18   be back within seven days?
19       MS. LEHMANN:  Oh, yeah.  I'll be back in two days.
20       MR. ROBERTS:  We're good.
21       MS. LEHMANN:  Thank you.  I apologize, I don't
22   want my schedule to be the issue.
23       (Proceedings concluded at 4:26 p.m.)
24
25

# C E R T I F I C A T E

STATE OF WASHINGTON )
COUNTY OF KING )

    I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to administer
oaths and affirmations in and for the State of Washington,
do hereby certify:

    That the annexed and foregoing arbitration
proceeding was taken stenographically before me and reduced
to typewriting under my direction;

I further certify that I am not a relative or employee or
attorney or counsel of any of the parties to said action,
or a relative or employee of any such attorney or counsel,
and that I am not financially interested in the said action
or the outcome thereof;

I further certify that the testimony as transcribed, is a
full, true and correct transcript of the testimony,
including questions and answers, and all objections,
motions, and exceptions of counsel made and taken at the
time of the foregoing examination;

I further certify that I am promptly delivering the annexed
and foregoing transcript to all ordering parties and to the
arbitrator.


IN WITNESS WHEREOF, I have hereunto
set my hand and affixed my official seal this
_____ day of _____ 2011.

**$**

$300 [3] - 12:15, 19:22, 44:22
$750 [1] - 12:9

**'**

'07 [1] - 10:25
'09 [4] - 18:22, 24:12, 25:22
'90s [1] - 10:8

**1**

1 [5] - 4:19, 13:4, 13:11, 17:8, 29:3
1-1 [1] - 10:25
1-1-10 [2] - 41:4, 45:19
10 [2] - 5:15, 17:13
10-26-09 [1] - 22:19
100 [1] - 17:21
104.35 [1] - 23:11
11 [6] - 6:16, 11:15, 11:16, 13:18, 14:7, 41:22
12 [4] - 14:10, 17:20, 22:7, 22:22
12-31 [1] - 18:22
12-31-09 [1] - 18:25
128,000 [1] - 20:1
13 [1] - 26:12
131,000 [1] - 19:25
135,000 [1] - 19:25
14 [4] - 5:14, 5:16, 8:9, 33:9
14.1 [1] - 8:11
15 [10] - 4:21, 5:5, 5:11, 5:12, 5:20, 7:2, 10:18, 10:20, 27:3, 29:19
158 [28] - 11:22, 12:23, 31:4, 31:17, 31:18, 36:2, 43:16, 43:20, 44:1, 44:10, 44:13, 44:18, 45:7, 45:21, 46:10, 46:13, 46:20, 46:23, 46:25, 48:10, 49:8, 49:16, 51:1, 52:1, 52:2, 52:4
158's [1] - 44:17
186 [1] - 13:20
1995 [2] - 8:19, 8:21
1997 [1] - 9:1
1st [1] - 9:18

**2**

2 [1] - 17:20
2005 [1] - 7:12

2005-2008 [1] - 8:10
2005ish [1] - 7:24
2007 [1] - 11:21
2008 [1] - 12:2
2008's [1] - 15:18
2008-2009 [1] - 39:11
2009 [18] - 11:9, 13:16, 15:7, 15:19, 15:20, 17:19, 18:17, 21:4, 21:20, 22:12, 23:16, 24:6, 24:7, 25:7, 25:10, 30:13, 32:12, 32:24
2010 [8] - 9:18, 15:20, 15:21, 25:11, 29:3, 29:6, 41:6, 41:13
2011 [2] - 23:16, 41:17
21 [4] - 3:10, 8:9, 44:3
22 [3] - 3:10, 5:14, 5:15
27 [1] - 7:3
28 [2] - 3:5, 22:12
28th [1] - 22:20
29,000 [1] - 7:3

**3**

3 [14] - 3:10, 13:4, 13:10, 15:19, 15:20, 21:7, 21:9, 22:2, 22:23, 24:21, 25:2, 37:8, 37:9
300 [1] - 19:23

**4**

4 [4] - 3:5, 13:4, 16:10, 16:16
4-21-2011 [2] - 22:13
401 [1] - 45:5
401(a [4] - 42:13, 43:4, 45:6, 45:14
401(b [1] - 42:7
403(b [6] - 8:18, 8:24, 9:3, 9:7, 10:8, 26:23
403(b)(7 [1] - 8:24
41 [1] - 3:6
45 [1] - 28:10
457(b [2] - 9:7, 42:10
457(b) [1] - 9:7
46 [2] - 3:6, 28:10

**5**

5 [2] - 14:1, 41:20
5.8 [4] - 16:13, 16:19, 17:12, 17:13
50,000 [1] - 28:9
5:00 [1] - 20:21

**6**

61 [1] - 37:12
65 [6] - 16:25, 18:7, 18:11, 42:23, 44:4, 44:5

**7**

7 [2] - 8:10, 32:24
70 [2] - 18:11, 18:12
746 [1] - 12:10
750 [3] - 44:14, 45:10, 45:15
750's [1] - 45:1

**8**

8 [1] - 32:21
800 [1] - 39:25
85 [5] - 10:24, 13:6, 13:8, 13:9, 35:14, 35:17
8:00 [1] - 20:21

**9**

90 [1] - 18:6
97 [1] - 39:6
97.26 [2] - 37:24, 38:2
98 [2] - 37:13, 37:18

**A**

a.m [1] - 20:21
ABC [1] - 13:25
ability [1] - 12:12
able [6] - 21:16, 23:20, 45:19, 49:18, 49:24, 50:23
absolutely [1] - 50:25
Absolutely [1] - 20:18
access [2] - 39:21, 39:24
accomplish [1] - 11:17
account [5] - 13:1, 13:2, 19:15, 23:15, 33:21
accounting [7] - 32:2, 33:7, 33:13, 35:15, 46:20, 46:23, 47:1
Accounting [3] - 11:22, 31:21, 31:22
accounts [2] - 24:10, 41:6
accrual [1] - 36:22
accruals [5] - 12:24, 42:17, 42:25, 43:2, 43:3
accruing [1] - 43:6
accuracy [1] - 26:15

accurate [1] - 20:12
accurately [2] - 8:15, 8:18
acquisitions [1] - 36:8
active [1] - 5:21
actual [10] - 15:17, 21:22, 23:2, 23:5, 23:11, 24:5, 24:8, 24:18, 39:2, 50:20
actuarial [6] - 20:2, 36:10, 36:13, 36:15, 36:19, 37:1
add [4] - 5:10, 9:19, 13:9, 42:9
add-ons [1] - 5:10
added [2] - 10:25, 13:1, 13:21
additional [7] - 8:4, 25:12, 35:7, 36:22, 37:6, 45:15, 52:21
address [1] - 12:22
addressed [1] - 46:25
addresses [1] - 46:20
administrator [1] - 13:24
admitted [5] - 3:10, 22:2, 22:25, 24:21, 25:1
affected [2] - 28:9, 41:7
affidavit [3] - 51:17, 51:20, 52:23
age [15] - 13:8, 16:25, 18:1, 18:7, 18:11, 26:20, 26:21, 36:10, 36:16, 37:2, 37:12, 42:23, 44:4, 44:5
agency [1] - 32:6
ages [1] - 19:19
aggregate [1] - 16:21
ago [4] - 5:12, 5:20, 7:2, 29:19
agreement [2] - 8:10, 48:15
agreements [2] - 28:24, 28:25
Alaska [3] - 6:17, 6:19, 6:23
allow [2] - 34:5, 34:25
allowed [1] - 13:10
almost [1] - 12:15
alone [1] - 52:23
ambiguous [2] - 29:9, 29:23
Amidon [1] - 37:10
amount [1] - 38:22
analysis [2] - 25:12
analyst [1] - 4:19
analytics [1] - 4:25
announcement [2] -

25:6, 25:23
annual [2] - 12:24, 45:18
Annuity [1] - 8:12
annuity [10] - 8:16, 11:2, 19:17, 19:18, 19:19, 19:21, 19:22, 20:13, 42:23
answer [6] - 10:7, 10:20, 37:23, 39:14, 40:6
answered [1] - 12:20
anticipated [3] - 11:9, 25:6, 25:23
appeared [1] - 22:6
applies [2] - 21:19, 43:17
apply [2] - 35:16, 45:7
appropriate [1] - 8:20
approved [4] - 25:16, 25:19, 29:20, 30:11
approximate [1] - 6:25
April [4] - 11:9, 25:6, 25:10, 32:24
arbitrated [1] - 11:5
arbitration [2] - 8:7, 9:13
ARBITRATOR [86] - 4:7, 4:9, 4:11, 6:15, 6:20, 6:22, 9:2, 9:8, 9:19, 9:22, 10:1, 10:5, 10:11, 16:9, 16:12, 16:23, 17:3, 17:5, 17:17, 21:14, 21:24, 22:4, 22:11, 22:14, 23:1, 23:17, 23:20, 23:24, 24:22, 24:24, 25:3, 27:17, 27:20, 27:22, 29:10, 29:24, 30:4, 30:8, 31:10, 31:13, 32:17, 32:20, 33:18, 33:24, 34:2, 34:13, 34:16, 34:19, 35:3, 35:9, 35:19, 35:23, 36:4, 37:3, 37:5, 38:12, 38:15, 40:14, 40:19, 40:22, 41:22, 42:5, 43:8, 43:10, 43:15, 43:22, 44:15, 44:22, 45:24, 46:17, 47:3, 47:8, 47:16, 47:18, 47:25, 48:13, 49:2, 49:15, 50:22, 51:5, 51:11, 51:19, 51:24, 52:8, 52:17, 52:25
Arbitrator [14] - 4:15, 10:19, 11:10, 11:17, 15:2, 18:3, 19:13, 26:14, 28:8, 33:14,

40:3, 40:24, 41:19, 42:2
**area** [1] - 50:14
**argue** [2] - 47:12, 52:19
**argument** [2] - 32:18, 48:22
**arrived** [1] - 5:12
**Article** [4] - 5:14, 5:16, 8:9, 8:11
**assertion** [1] - 47:23
**assessments** [1] - 27:14
**assets** [1] - 44:11
**assist** [1] - 28:7
**associated** [2] - 13:15, 35:7
**assume** [1] - 29:24
**assumption** [3] - 17:3, 17:5, 24:5
**Assumptions** [1] - 23:3
**assumptions** [5] - 15:8, 15:11, 16:2, 16:7, 39:8
**assure** [2] - 32:13, 32:16
**attempting** [1] - 11:17
**attributable** [1] - 24:17
**available** [2] - 18:4, 18:15
**Avenue** [1] - 50:12
**average** [2] - 42:22, 42:23
**award** [1] - 43:4
**aware** [5] - 14:7, 14:8, 46:18, 49:10, 49:12

### B

**background** [3] - 4:16, 9:9, 52:6
**bad** [1] - 50:8
**balance** [11] - 10:22, 11:25, 12:6, 12:10, 12:11, 13:2, 19:16, 36:14, 36:23, 42:19, 44:12
**bargain** [1] - 26:3
**bargained** [1] - 26:7
**bargaining** [3] - 7:6, 7:19, 26:2
**base** [1] - 18:18
**based** [7] - 15:8, 15:17, 20:14, 37:1, 42:18, 43:3, 47:1
**Based** [3] - 17:3, 17:18, 39:8
**basis** [1] - 27:5

**became** [1] - 29:2
**begin** [1] - 11:24
**benefit** [31] - 10:22, 12:24, 18:4, 18:5, 18:9, 18:14, 18:15, 18:21, 19:3, 19:8, 19:16, 19:17, 20:3, 20:5, 20:11, 20:14, 20:15, 24:12, 24:15, 27:2, 36:9, 36:17, 36:18, 36:22, 37:1, 42:25, 43:4, 44:4, 44:5
**benefits** [10] - 4:18, 11:1, 35:12, 36:2, 36:14, 40:2, 42:20, 43:3, 43:6, 44:2
**best** [2] - 11:5, 43:25
**better** [1] - 51:14
**between** [11] - 6:18, 6:20, 6:23, 22:18, 22:21, 25:10, 26:15, 42:6, 44:10, 44:25, 47:23
**big** [2] - 50:3, 50:4
**binder** [1] - 3:12
**bit** [3] - 31:19, 48:2, 50:14
**Board** [1] - 11:23
**board** [7] - 25:17, 25:20, 29:20, 30:11, 30:15, 30:16, 30:19
**Boehme** [5] - 19:7, 20:8, 20:16, 27:9, 39:16
**Boehme's** [2] - 19:16, 20:2
**bond** [5] - 10:1, 12:14, 44:19
**bonds** [1] - 12:13
**borrow** [1] - 48:5
**bottom** [2] - 22:13, 37:11
**box** [1] - 38:17
**brief** [5] - 21:25, 27:21, 46:1, 50:20, 52:18
**briefly** [1] - 40:23
**briefs** [2] - 47:9, 47:15
**bring** [1] - 20:23
**Brown** [1] - 13:25
**built** [2] - 25:14, 25:15
**buy** [1] - 49:19
**buying** [1] - 13:25
**BY** [4] - 4:14, 28:2, 41:2, 46:8

### C

**calculable** [2] - 22:1,

22:5
**calculate** [1] - 22:9
**calculation** [2] - 22:15, 22:17
**calculations** [1] - 18:2, 36:12
**calculator** [1] - 39:9
**California** [3] - 6:17, 6:19, 6:23
**cannot** [1] - 44:17
**cap** [1] - 16:10
**capability** [1] - 12:14
**capital** [1] - 12:12
**capped** [1] - 13:4
**career** [1] - 42:22
**carry** [1] - 44:4
**case** [1] - 52:18
**cash** [5] - 10:21, 13:2, 36:14, 36:23, 42:19
**catches** [1] - 48:1
**center** [1] - 50:5
**certain** [2] - 18:20, 34:22
**Certainly** [1] - 21:25
**certainly** [1] - 35:4
**certified** [1] - 4:18
**cetera** [1] - 25:15
**challenge** [2] - 51:19, 52:15
**change** [31] - 10:7, 11:21, 12:8, 12:17, 12:18, 12:23, 13:6, 14:4, 15:12, 15:25, 16:19, 19:19, 19:23, 20:8, 21:23, 23:4, 23:5, 25:23, 28:8, 29:20, 29:25, 31:14, 37:1, 42:8, 43:13, 46:11, 46:14, 46:15, 46:18, 47:1, 47:24
**changed** [9] - 12:20, 13:5, 18:8, 19:18, 20:3, 20:14, 30:6, 42:14, 46:24
**Changes** [1] - 30:6
**changes** [32] - 11:3, 11:6, 13:11, 13:16, 13:18, 25:6, 25:13, 26:2, 26:3, 26:4, 28:18, 28:19, 28:23, 29:2, 29:13, 29:18, 30:3, 30:8, 31:7, 31:8, 31:9, 31:10, 33:6, 37:17, 37:20, 38:16, 38:25, 51:1, 51:6, 52:3
**changing** [1] - 19:18
**chart** [2] - 14:24, 17:18
**chartered** [1] - 4:19

**choice** [2] - 49:25, 50:25
**chose** [1] - 20:17
**church** [2] - 9:17, 10:16
**clarification** [4] - 20:17, 28:3, 35:20, 40:24
**clarify** [4] - 30:1, 35:22, 41:25, 50:16
**classify** [2] - 26:17, 26:18
**clear** [1] - 46:9
**closed** [1] - 28:25
**clue** [1] - 33:8
**Code** [1] - 8:23
**collective** [1] - 7:6
**collectively** [1] - 26:6
**column** [1] - 15:12
**comfortable** [1] - 28:12
**coming** [3] - 19:16, 21:2, 48:9
**comment** [3] - 26:14, 27:8, 52:7
**comments** [1] - 27:8
**commission** [2] - 14:1, 14:2
**committee** [2] - 30:14, 30:18
**committees** [1] - 30:21
**communicated** [1] - 17:14
**communication** [1] - 25:14
**comp** [1] - 5:1
**company** [1] - 8:17
**Comparison** [1] - 3:10
**comparison** [2] - 14:23, 17:18
**compensation** [8] - 15:18, 15:19, 18:1, 23:3, 23:4, 23:5, 24:5, 24:6
**complex** [1] - 28:5
**complicated** [1] - 41:24
**comply** [1] - 46:23
**concept** [1] - 41:24
**concern** [1] - 11:7
**concerned** [2] - 34:19, 35:5
**confine** [1] - 42:5
**confused** [1] - 35:20
**connection** [2] - 47:22, 47:23
**conservative** [2] - 15:24, 39:3
**conservatively** [1] -

39:5
**constant** [1] - 25:12
**consult** [2] - 7:12, 51:16
**consulted** [2] - 7:9, 7:18
**contacted** [2] - 20:16
**contained** [1] - 14:25
**contemplate** [1] - 47:8
**contending** [1] - 43:18
**content** [1] - 21:13
**context** [1] - 28:7
**contingencies** [2] - 26:1, 26:6
**contingency** [4] - 34:5, 34:24, 34:25, 35:8
**Contingency** [1] - 34:10
**continue** [7] - 24:23, 34:6, 34:22, 34:25, 37:1, 44:17, 49:21
**continued** [2] - 15:7, 38:18
**Continued** [1] - 25:12
**continues** [1] - 10:15
**contract** [1] - 7:9
**contrary** [1] - 48:21
**contribution** [2] - 10:23, 41:13
**contributions** [1] - 41:10
**convert** [1] - 19:20
**converted** [2] - 9:18, 10:21
**copy** [3] - 23:17, 23:24, 24:2
**Core** [14] - 10:9, 11:19, 13:12, 17:13, 26:25, 42:6, 42:7, 42:13, 42:14, 42:16, 42:25, 43:2, 43:6, 43:18
**core** [3] - 10:10, 10:12, 47:12
**Correct** [20] - 5:7, 8:13, 9:11, 17:4, 17:23, 20:7, 23:14, 24:9, 25:8, 28:6, 28:15, 28:21, 29:4, 33:22, 38:7, 41:5, 41:15, 41:18, 45:22, 48:12
**correct** [26] - 5:9, 9:10, 9:25, 14:17, 16:23, 25:7, 28:9, 29:6, 31:13, 33:20, 34:8, 38:18, 39:7, 39:8, 39:22, 40:5, 41:4, 41:11, 41:12,

41:17, 45:13, 46:12, 48:19, 49:23, 50:25, 51:3
**cost** [2] - 14:5, 26:7, 51:11
**costs** [1] - 35:7
**Counsel's** [1] - 33:15
**Counselor** [1] - 34:8
**course** [3] - 22:4, 26:10, 49:14
**court** [1] - 50:4
**cover** [1] - 6:13
**covered** [8] - 9:3, 9:5, 9:6, 13:22, 27:11, 35:13, 35:16, 46:4
**CPI** [5] - 13:4, 13:10, 17:8
**create** [1] - 16:1
**credit** [3] - 36:9, 36:15, 36:24
**crediting** [1] - 13:3
**criteria** [1] - 18:13
**criticism** [1] - 27:12
**criticisms** [1] - 27:8
**cross** [1] - 27:23
**Cross** [2] - 3:5, 27:17
**CROSS** [1] - 28:1
**crucial** [1] - 51:25
**curiosity** [1] - 10:5
**curious** [4] - 9:19, 31:7, 32:10, 37:9
**Current** [3] - 15:5, 42:3, 42:16
**current** [4] - 15:6, 18:1, 26:18, 35:2

## D

**date** [10] - 18:20, 19:5, 22:7, 22:8, 22:12, 22:14, 22:15, 22:16, 22:19, 25:21
**dated** [1] - 32:24
**days** [1] - 52:11
**deal** [1] - 29:15
**December** [1] - 25:22
**decide** [2] - 50:20, 52:21
**decided** [1] - 26:4
**decision** [2] - 52:12, 52:14
**deck** [4] - 11:13, 13:18, 32:12, 41:20
**decline** [1] - 11:2
**declining** [1] - 10:25
**deferral** [1] - 42:12
**Deferred** [1] - 8:12
**deferred** [1] - 8:16
**defined** [3] - 10:3, 10:22, 10:23

**degree** [1] - 52:14
**degrees** [1] - 4:17
**deposits** [1] - 41:6
**Deposits** [1] - 41:8
**describe** [1] - 18:3
**described** [2] - 8:15, 51:6
**describes** [1] - 20:9
**difference** [12] - 21:21, 22:18, 22:21, 23:2, 23:15, 24:4, 24:10, 24:17, 41:16, 42:6, 44:10, 44:25
**differences** [2] - 24:16, 26:15
**different** [8] - 9:23, 11:3, 15:21, 24:6, 36:2, 36:7, 43:1
**differently** [2] - 47:1
**direct** [2] - 31:2, 34:4
**Direct** [1] - 3:5
**DIRECT** [1] - 4:13
**directed** [1] - 17:10
**director** [2] - 4:24, 7:5
**directors** [5] - 29:20, 30:11, 30:15, 30:16, 30:19
**disagree** [1] - 19:11
**disagreement** [1] - 51:20
**discovered** [1] - 22:5
**discussing** [1] - 47:20
**discussion** [1] - 8:7
**Document** [1] - 24:3
**document** [6] - 14:9, 21:6, 21:11, 21:13, 33:10, 33:12
**done** [3] - 17:19, 29:6, 29:11
**down** [5] - 22:13, 22:19, 31:19, 35:14, 45:12
**drill** [1] - 31:19
**due** [1] - 8:4
**duly** [1] - 4:5

## E

**e-mail** [3] - 7:24, 14:12, 14:21
**early** [5] - 13:8, 36:16, 49:4, 49:6, 50:10
**earned** [1] - 23:6
**earnings** [1] - 24:8
**easier** [1] - 51:14
**economics** [1] - 4:17
**education** [1] - 25:14
**educational** [1] - 4:16
**effect** [4] - 5:19, 12:2, 37:19, 48:6

**effective** [3] - 29:3, 41:4, 45:19
**eight** [1] - 52:10
**either** [2] - 3:11, 25:21
**electronically** [1] - 23:22
**eligible** [6] - 6:2, 6:5, 18:4, 18:6, 18:20, 19:3, 24:13, 24:14
**eliminated** [1] - 10:24
**employed** [3] - 4:20, 4:21, 5:2
**employee** [8] - 4:18, 6:7, 13:22, 14:2, 23:6, 26:21, 44:3, 44:8
**employees** [26] - 5:21, 5:25, 6:2, 6:4, 6:10, 6:14, 6:25, 7:19, 9:5, 9:6, 15:24, 17:20, 18:4, 18:6, 18:16, 18:17, 18:24, 19:2, 20:24, 26:7, 28:9, 28:20, 34:22, 34:23, 35:13, 38:23
**Employees** [2] - 5:25, 36:2
**employees'** [1] - 41:6
**employer** [4] - 8:3, 21:11, 42:18
**EMPLOYER** [1] - 3:3
**Employer** [7] - 3:10, 21:7, 21:9, 22:2, 22:23, 24:21, 25:2
**employer's** [2] - 8:5, 48:23
**Employer's** [1] - 37:8
**end** [7] - 14:1, 14:3, 18:16, 21:25, 30:13, 37:13, 48:15
**enhancement** [1] - 13:8
**ensure** [1] - 18:5
**entirely** [1] - 49:17
**entirety** [1] - 47:10
**equal** [1] - 13:9
**equipment** [2] - 44:20, 49:19
**equity** [1] - 17:15
**equivalents** [1] - 28:10
**ERISA** [4] - 9:13, 9:18, 10:16, 31:23
**error** [2] - 22:1, 22:5
**essence** [1] - 6:10
**estimated** [4] - 21:22, 23:4, 24:7, 24:18
**estimates** [2] - 15:16, 39:3
**estimating** [1] - 39:6

**et** [1] - 25:15
**evaluation** [1] - 21:13
**event** [2] - 26:1, 48:21
**evidence** [3] - 21:25, 22:25, 24:21
**evolve** [2] - 48:3, 49:13
**evolved** [1] - 49:12
**exact** [1] - 25:21
**EXAMINATION** [5] - 3:2, 4:13, 28:1, 41:1, 46:7
**examination** [3] - 27:17, 27:23, 31:2
**exceeds** [1] - 16:15
**except** [2] - 22:7, 35:13
**exceptions** [2] - 6:4, 6:11
**excess** [2] - 11:25, 17:7
**excluded** [2] - 6:6, 6:7
**excludes** [1] - 8:1
**excluding** [1] - 26:22
**excuse** [1] - 8:9
**exempt** [3] - 11:23, 12:7, 12:13
**Exhibit** [14] - 3:10, 5:14, 5:15, 6:16, 11:15, 13:18, 17:20, 21:9, 22:2, 25:1, 32:21, 37:8, 37:9
**exhibit** [2] - 11:14, 41:21
**exhibits** [1] - 3:11
**Exhibits** [1] - 3:12
**expect** [4] - 15:7, 15:10, 48:17, 52:22
**expectancy** [1] - 20:2
**expected** [2] - 15:13, 17:15
**expenses** [1] - 13:22
**expert** [12] - 48:9, 48:15, 49:25, 50:19, 50:24, 51:8, 51:16, 51:17, 52:13, 52:19, 52:20, 52:23
**explain** [7] - 10:4, 13:14, 14:16, 15:2, 21:21, 42:2, 43:24
**explained** [1] - 21:16
**explanation** [1] - 43:21
**exponentially** [1] - 44:8
**exposure** [1] - 8:4
**extent** [1] - 41:24
**extra** [2] - 23:17, 51:11

## F

**facilities** [1] - 44:20
**fact** [1] - 34:19
**factor** [1] - 20:1
**factored** [3] - 24:12, 24:13, 36:13
**factors** [1] - 17:24
**failed** [1] - 21:11
**fair** [2] - 14:19, 25:24
**familiar** [1] - 50:12
**FAS** [3] - 11:22, 12:23, 31:4, 31:18, 31:20, 32:2, 32:5, 33:21, 35:15, 36:2, 43:16, 43:20, 44:1, 44:9, 44:13, 44:17, 44:18, 45:7, 45:21, 46:10, 46:13, 46:20, 46:23, 48:10, 49:8, 49:16, 51:1, 52:1, 52:2
**FASB** [5] - 11:22, 31:3, 31:17, 31:18, 32:7
**faster** [1] - 17:6
**feasible** [2] - 40:5, 40:17
**federal** [3] - 32:5, 32:6, 32:7
**fees** [2] - 13:23, 13:24
**felt** [1] - 34:20
**few** [3] - 6:4, 6:8, 6:11
**Fidelity** [2] - 13:23, 14:4
**final** [2] - 15:12, 42:22
**finance** [1] - 4:17
**Financial** [3] - 11:22, 31:21, 31:22
**financials** [1] - 12:3
**fine** [2] - 29:2, 31:1
**first** [13] - 9:15, 14:17, 14:19, 29:14, 29:17, 32:22, 37:8, 37:10, 38:17, 45:6, 49:15, 52:1, 52:9
**First** [1] - 41:3
**five** [1] - 27:20
**fixed** [1] - 17:14
**Fletcher** [3] - 32:23, 32:25, 33:5
**flight** [1] - 50:10
**fluctuate** [1] - 19:21
**focused** [1] - 52:2
**focusing** [1] - 37:8
**following** [1] - 51:22
**follows** [2] - 4:5, 51:2
**food** [1] - 50:4
**footnote** [1] - 12:3
**for-profit** [2] - 11:24,

12:6
Forget [1] - 40:16
form [1] - 40:18
former [3] - 17:22, 34:23, 41:14
formula [1] - 42:19
formulas [2] - 36:23, 42:24
foundation [2] - 32:22, 33:22
four [1] - 50:6
frankly [1] - 48:1
free [2] - 20:20, 47:7
freeze [1] - 36:1
Friday [3] - 20:21, 21:15, 21:17
front [2] - 14:1, 14:3
front-end [2] - 14:1, 14:3
froze [1] - 10:24
Frozen [3] - 42:7, 42:14, 43:2
frozen [4] - 12:25, 35:12, 36:21, 43:19
Full [1] - 28:10
function [1] - 49:18
Fund [1] - 14:5
fund [5] - 10:2, 13:19, 13:21, 13:25, 16:15
funding [1] - 10:2
funds [5] - 9:22, 9:23, 14:3, 16:14, 16:20
future [5] - 12:24, 35:12, 44:2, 44:8, 44:11

### G

general [2] - 6:13, 10:3
given [2] - 15:11, 27:7
Given [1] - 24:13
government [1] - 9:4
Government [1] - 9:6
governmental [1] - 9:7
gray [1] - 50:14
great [1] - 29:15
grew [1] - 44:9
grievance [10] - 30:9, 31:11, 31:12, 34:11, 34:14, 34:22, 37:17, 38:24, 39:11, 40:4
grows [1] - 45:18
guarantees [1] - 39:4
guess [3] - 22:11, 35:19, 43:15
guys [1] - 51:12

### H

half [1] - 38:17
hand [3] - 14:13, 21:6, 49:6
handed [1] - 24:3
harm [2] - 38:25, 39:2
hate [3] - 35:23, 49:4, 51:11
head [1] - 7:17
health [1] - 4:25
Health [1] - 5:2
hear [2] - 32:13, 40:12
heard [8] - 5:18, 19:7, 25:5, 32:9, 32:11, 35:4, 48:20, 49:15
hearing [6] - 9:24, 21:8, 47:15, 48:8, 49:7, 52:21
held [1] - 5:10
help [5] - 20:24, 32:23, 32:25, 37:4, 43:9
helpful [1] - 43:24, 45:23, 45:24
herein [1] - 4:4
hire [1] - 26:19
Honor [4] - 10:6, 16:18, 42:9, 47:17
hope [2] - 45:23, 52:24
hotel [1] - 50:12
HR [2] - 4:24, 4:25
human [2] - 4:18, 30:14
hundred [1] - 26:22
hybrid [1] - 10:21

### I

I.e [1] - 6:5
idea [5] - 15:24, 29:1, 31:24, 32:4, 39:1
identical [1] - 22:6
identified [2] - 11:9, 22:22
impact [15] - 12:3, 15:25, 20:25, 43:16, 44:18, 44:23, 47:9, 47:12, 48:3, 49:16, 49:17, 52:3, 52:4, 52:20
impacted [1] - 14:7
impacts [1] - 44:21
implement [1] - 26:4
implementation [1] - 25:10
implication [1] - 44:17
implies [2] - 8:16, 44:19
impression [2] -

44:22, 48:16
inappropriate [1] - 34:18
include [1] - 12:5
included [1] - 26:24
including [1] - 11:24
income [2] - 17:14, 18:17
incorrect [1] - 39:23
increase [3] - 16:13, 19:20, 49:19
increased [3] - 15:19, 15:20, 18:8
increases [1] - 17:6
incur [1] - 45:14
indicated [1] - 34:4
individual [6] - 15:1, 15:3, 16:17, 16:25, 17:1, 20:25
individualized [1] - 18:2
information [1] - 15:17
informed [3] - 11:7, 27:13, 39:17
input [2] - 8:5, 39:8
inquire [1] - 40:2
inquiry [1] - 7:25
instance [1] - 15:17
insurance [2] - 8:17
interest [5] - 13:3, 36:9, 36:14, 36:24
interested [1] - 37:11
Internal [1] - 8:23
International [1] - 50:11
interrupt [1] - 35:23
interstate [1] - 50:5
investment [1] - 16:15
investments [1] - 16:21
invite [1] - 47:4
involved [5] - 28:16, 28:19, 29:14, 29:15, 29:16
issuance [1] - 12:14
issue [9] - 9:13, 12:13, 32:8, 35:5, 47:22, 48:11, 48:14, 49:4, 52:5
issued [2] - 11:22, 31:18
issues [1] - 12:22
itself [2] - 19:22, 33:15
IUOE [6] - 7:14, 7:20, 11:5, 14:7, 18:24, 19:2

### J

January [4] - 9:17, 25:11, 29:3, 29:6
Joint [3] - 5:13, 5:15, 8:9
judge [1] - 9:3

### K

keep [2] - 13:10, 14:4
kind [6] - 10:23, 23:19, 27:5, 31:19, 32:21, 33:9
knowledge [2] - 11:5, 20:10
known [2] - 13:2, 26:25
knows [1] - 33:17

### L

labor [2] - 28:24, 28:25
language [2] - 7:10, 8:8
last [5] - 5:5, 5:10, 10:18, 10:20, 37:24
late [2] - 10:8, 25:22
law [5] - 40:11, 40:13, 40:15, 40:16
leased [1] - 6:7
least [2] - 18:6, 51:16
leave [2] - 11:1, 50:8
left [2] - 15:5, 42:16
Lehmann [6] - 3:5, 3:6, 32:22, 33:12, 34:1, 39:16
LEHMANN [31] - 4:14, 9:21, 21:15, 22:10, 22:24, 23:22, 24:20, 25:2, 25:4, 27:15, 29:8, 29:22, 30:2, 33:14, 34:3, 35:22, 40:18, 40:23, 41:2, 41:23, 45:4, 45:23, 46:3, 47:4, 47:14, 48:20, 49:14, 50:15, 51:23, 52:16, 52:24
less [5] - 13:10, 24:7, 38:9, 38:13, 38:22
letter [4] - 32:24, 32:25, 33:1, 33:6, 33:15, 33:23
level [2] - 4:19, 49:19
liabilities [1] - 44:2
liability [8] - 8:4, 11:24, 44:8, 44:9, 44:11, 45:2, 45:10, 45:20
life [2] - 19:23, 20:2

light [1] - 25:13
lines [1] - 37:11
listen [1] - 45:25
listened [2] - 48:2, 49:3
literally [1] - 22:6
load [2] - 14:1, 14:3
local [4] - 26:3, 26:9, 35:6
log [1] - 16:5, 16:6
log-in [2] - 16:5, 16:6
look [23] - 5:14, 6:8, 16:17, 16:18, 23:21, 24:1, 26:24, 27:6, 32:21, 33:1, 33:9, 36:12, 40:9, 40:13, 40:14, 45:18, 47:6, 49:11, 49:18, 49:25, 51:15, 52:15
looked [1] - 33:3, 52:5
Looking [4] - 8:11, 37:10, 37:12, 37:24
looking [11] - 9:4, 14:12, 16:24, 16:25, 17:1, 17:2, 18:10, 26:19, 26:20, 40:6, 42:13
looks [2] - 14:23, 23:10
loss [1] - 12:5
lost [2] - 19:4, 23:19
lowered [1] - 13:20
lump [4] - 10:25, 19:15, 19:20, 19:24

### M

mail [3] - 7:24, 14:12, 14:21
mandated [1] - 51:2
marked [8] - 3:10, 3:11, 3:12, 11:14, 14:9, 21:7, 21:9, 26:12
market [2] - 17:6, 44:11
match [1] - 26:23
materials [1] - 14:14
math [1] - 26:22
MCDONAGH [2] - 3:4, 4:3
McDonagh [2] - 4:8, 48:13
McDonagh's [2] - 50:23, 51:24
mean [9] - 6:11, 8:14, 31:20, 36:21, 41:25, 48:4, 48:5, 50:2
meaning [1] - 9:24
meaningful [1] - 21:13

means [1] - 48:10
meant [4] - 12:8, 12:11, 18:5, 39:3
meetings [1] - 30:23
members [1] - 14:7
mention [1] - 12:4
mentioned [5] - 5:13, 31:6, 39:15, 42:10, 42:11
mergers [1] - 36:7
merit [1] - 48:1
met [2] - 13:5, 13:7
methodology [3] - 21:19, 21:23, 26:14
might [8] - 15:7, 15:10, 17:13, 19:14, 19:24, 19:25, 20:1, 52:14
migrate [1] - 18:24
migration [1] - 19:4
million [6] - 12:9, 12:15, 44:14, 44:23, 45:10, 45:15
ministries [2] - 34:5, 35:6
ministry [5] - 7:7, 26:3, 26:8, 26:9, 26:10
minute [1] - 16:6
minutes [1] - 30:23
misheard [1] - 50:17
misinterpreting [1] - 35:25
miss [1] - 47:6
mission [2] - 12:16, 44:18
misunderstandings [1] - 19:14
modification [2] - 20:6, 45:5
modifications [14] - 10:17, 10:19, 11:8, 11:9, 11:10, 11:18, 12:21, 13:14, 20:4, 20:25, 25:10, 25:16, 41:3, 41:7
modified [5] - 13:4, 13:19, 14:6, 18:19, 26:16
moment [1] - 40:16
Monday [2] - 20:20, 21:18
money [2] - 11:1, 12:11, 48:5
Montana [3] - 6:17, 6:21, 6:22
month [1] - 19:23
monthly [5] - 19:17, 19:18, 19:19, 20:13, 20:15

moot [2] - 48:11, 48:14
morning [1] - 50:10
most [2] - 6:10, 28:12
Mount [1] - 20:24
move [1] - 24:20
moving [2] - 45:14, 45:19
MR [20] - 21:10, 22:3, 23:19, 24:1, 24:23, 25:1, 27:19, 28:2, 29:12, 30:3, 40:21, 46:8, 47:2, 47:21, 48:12, 48:19, 51:4, 51:9, 51:13, 52:7
MS [31] - 4:14, 9:21, 21:15, 22:10, 22:24, 23:22, 24:20, 25:2, 25:4, 27:15, 29:8, 29:22, 30:2, 33:14, 34:3, 35:22, 40:18, 40:23, 41:2, 41:23, 45:4, 45:23, 46:3, 47:4, 47:14, 48:20, 49:14, 50:15, 51:23, 52:16, 52:24
multi [1] - 8:3
multi-employer [1] - 8:3
multiply [2] - 42:21, 42:22
must [1] - 46:15
Must [2] - 46:17, 46:18
muster [1] - 49:1
mutual [6] - 10:2, 13:19, 13:21, 16:14, 16:15, 16:20

**N**

name [4] - 4:7, 5:24, 8:20, 43:5
necessarily [1] - 20:13
need [5] - 18:19, 25:13, 25:16, 27:17, 44:12
needed [4] - 12:19, 12:22, 29:5, 29:11
needs [1] - 50:19
negotiate [1] - 26:11
negotiated [1] - 35:1
negotiations [1] - 28:24
never [4] - 5:18, 11:7, 32:9, 50:10
Never [1] - 48:19
new [13] - 15:9, 15:11, 15:13, 23:10, 26:11, 26:19, 26:21, 38:1,

43:5, 44:20, 47:1, 49:19
New [3] - 23:4, 42:3, 42:13
next [2] - 19:25, 26:10
night [1] - 50:8
non [3] - 9:10, 28:16, 28:20
non-profit [1] - 9:10
non-represented [1] - 28:20
non-union [1] - 28:16
None [1] - 7:8
note [3] - 6:15, 21:19, 24:25
notes [1] - 35:11, 35:14
nothing [2] - 33:17, 46:10
noticed [1] - 16:12
November [1] - 25:22
number [9] - 6:13, 6:25, 11:3, 13:20, 20:19, 20:20, 24:6, 37:24, 39:25
numbers [6] - 15:21, 21:22, 23:11, 38:16

**O**

object [1] - 29:22
Object [1] - 40:18
objection [5] - 21:10, 24:23, 24:24, 33:20, 34:2, 40:20
Objection [2] - 29:8, 33:14
objections [1] - 24:22
obligations [1] - 48:24
obviously [4] - 35:25, 47:8, 48:20, 50:2
occasion [1] - 7:11
occupational [1] - 4:25
occurred [4] - 7:22, 7:23, 19:4, 49:9
occurring [4] - 42:17, 42:25, 43:1, 43:3
October [8] - 17:19, 21:3, 21:20, 22:12, 24:6, 24:11, 24:12, 32:12
offer [2] - 13:20, 51:22
offered [4] - 8:19, 8:21, 14:3, 28:4
offerings [2] - 13:20, 44:19
office [5] - 20:17, 20:23, 21:17, 28:4, 50:9

old [6] - 15:14, 23:12, 34:6, 39:7, 44:3
older [2] - 36:18, 42:19
one [14] - 16:19, 20:21, 22:12, 23:18, 26:20, 27:2, 34:15, 36:18, 42:9, 42:19, 45:18, 47:18, 49:6, 49:7
one-time [1] - 45:18
ongoing [2] - 26:8, 35:8
online [2] - 16:1, 40:2
ons [1] - 5:10
open [2] - 14:10, 28:24
operations [1] - 4:25
opportunity [7] - 21:12, 27:8, 47:21, 48:9, 49:25, 51:7, 51:15
order [5] - 12:22, 18:13, 18:20, 40:3, 49:18
Oregon [1] - 6:19
organization [2] - 9:10, 12:13
organizations [1] - 11:23
otherwise [2] - 19:4, 40:17
ought [4] - 23:18, 23:20, 49:5, 49:24, 50:23, 51:7
outside [1] - 8:6
overlooked [1] - 47:5
overrule [2] - 24:24, 33:19
own [3] - 16:7, 48:9, 48:15

**P**

p.m [1] - 20:21
PAGE [1] - 3:2
page [12] - 3:10, 5:14, 5:15, 8:10, 14:19, 14:22, 14:23, 17:20, 23:8, 37:10, 41:19
pages [5] - 14:17, 14:18, 14:20, 15:1, 15:3
paid [2] - 8:2, 26:8
Part [1] - 44:1
part [12] - 22:22, 29:1, 31:22, 32:12, 34:10, 34:20, 49:2, 49:3, 49:22, 50:13, 51:25
participate [4] - 7:20,

8:2, 8:3, 35:1
particular [1] - 7:7
parties [4] - 43:22, 47:12, 49:14, 50:18
pay [6] - 13:23, 14:2, 19:24, 42:22, 42:23, 45:2
payable [1] - 19:23
paying [2] - 44:24, 45:12
pension [20] - 5:22, 6:6, 8:2, 8:6, 10:8, 10:21, 11:19, 12:4, 12:17, 33:6, 34:6, 36:6, 36:7, 36:11, 36:15, 36:25, 42:20, 44:9, 48:7
people [7] - 8:2, 11:1, 12:25, 35:16, 36:9, 36:14, 36:15
percent [18] - 13:4, 14:1, 15:19, 15:20, 16:10, 16:16, 16:20, 17:12, 17:13, 17:21, 18:7, 23:12, 26:22, 37:14, 37:18, 38:2, 39:6, 42:21
percentage [1] - 16:18
Perfect [1] - 6:24
perform [1] - 16:6
performed [2] - 16:21, 22:16
perhaps [1] - 51:13
person [3] - 36:24, 36:25
perspective [3] - 8:5, 46:3, 48:11
Petersen [8] - 23:7, 23:18, 24:3, 24:4, 26:13, 27:9, 39:17, 52:4
PETERSEN [2] - 23:19, 52:7
phone [1] - 7:24
phrase [1] - 8:11
piece [1] - 17:15
place [2] - 26:1, 34:5
plan [79] - 5:13, 5:18, 5:19, 5:21, 5:22, 6:3, 6:7, 7:20, 8:1, 8:15, 8:21, 8:24, 9:12, 9:15, 9:16, 9:17, 9:18, 10:8, 10:13, 10:15, 10:16, 10:21, 10:22, 10:23, 11:2, 11:20, 13:14, 13:15, 13:19, 14:6, 16:17, 17:9, 17:11, 17:22, 18:20, 18:23, 18:24, 20:6, 23:13, 25:9,

26:5, 26:8, 26:16, 26:23, 26:25, 29:13, 30:3, 30:6, 33:6, 34:10, 34:15, 34:21, 35:2, 36:6, 36:7, 36:11, 36:22, 38:2, 38:5, 41:3, 41:14, 42:7, 42:11, 42:12, 42:20, 43:6, 44:18, 45:7, 46:14, 46:16, 46:21, 46:24, 46:25, 47:13
**Plan** [21] - 5:25, 6:1, 9:1, 10:9, 11:19, 13:12, 17:14, 26:25, 42:6, 42:7, 42:13, 42:14, 42:16, 42:25, 43:2, 43:5, 43:7, 43:18, 45:6
**plans** [17] - 8:2, 8:4, 8:6, 10:18, 27:4, 29:25, 30:18, 34:6, 34:11, 34:17, 37:19, 38:3, 38:25, 39:7, 39:10, 44:9, 46:12
**play** [1] - 10:12
**played** [1] - 48:17
**plural** [1] - 34:11
**plus** [5] - 13:4, 13:10, 13:11, 17:8
**point** [4] - 7:18, 22:8, 49:7, 50:14
**pointed** [1] - 22:1
**portion** [1] - 5:10
**position** [2] - 4:23, 5:5
**positions** [1] - 18:8
**possible** [4] - 38:8, 38:10, 38:12, 38:21
**possibly** [1] - 48:8
**post** [1] - 47:15
**post-hearing** [1] - 47:15
**pre** [2] - 3:12, 42:11
**pre-marked** [1] - 3:12
**pre-tax** [1] - 42:11
**precluding** [1] - 21:12
**predicated** [1] - 41:14
**preliminary** [2] - 33:18, 33:22
**preparation** [1] - 14:13
**prepare** [1] - 32:23
**prepared** [1] - 26:13
**preparing** [1] - 15:22
**present** [3] - 19:15, 19:21, 49:19
**presentation** [2] - 32:11, 32:14
**presented** [2] - 20:3, 22:20

**presently** [1] - 4:20
**preserved** [1] - 13:7
**presume** [1] - 29:15
**previous** [2] - 3:11, 38:3
**principle** [1] - 47:1
**principles** [1] - 46:24
**printed** [1] - 22:17
**printing** [1] - 22:15
**problem** [1] - 46:1
**Proceed** [1] - 4:11
**PROCEEDINGS** [1] - 4:1
**process** [2] - 13:24, 16:6
**product** [1] - 8:17
**Proffered** [1] - 3:12
**profit** [5] - 6:6, 9:10, 11:24, 12:5, 12:6
**program** [14] - 15:4, 15:6, 15:10, 15:11, 15:13, 15:14, 15:25, 16:18, 23:10, 26:11, 26:24, 27:2, 36:3, 38:7
**Program** [3] - 3:10, 15:5, 23:4
**project** [1] - 24:17
**projected** [3] - 17:21, 23:12, 42:23
**projecting** [1] - 26:15
**projection** [5] - 15:22, 16:7, 23:16, 26:17, 26:19
**projections** [10] - 15:4, 15:15, 15:16, 15:18, 17:19, 21:3, 38:6, 38:7, 38:21, 39:3
**projects** [1] - 24:17
**proposed** [2] - 11:11, 20:25
**protected** [1] - 19:17
**protection** [1] - 10:25
**provide** [1] - 26:13
**provided** [3] - 21:8, 24:5, 51:17
**Providence** [22] - 4:20, 4:22, 5:2, 5:20, 5:24, 7:20, 8:15, 8:19, 8:25, 9:9, 10:10, 12:8, 13:21, 25:17, 25:19, 27:4, 28:5, 28:23, 39:5, 45:1, 46:14, 46:15
**Providence's** [1] - 30:24
**provision** [3] - 8:1, 10:24, 46:13
**provisions** [1] - 11:3

**published** [1] - 30:23
**purpose** [1] - 15:22
**put** [1] - 45:20
**pyramid** [2] - 41:20, 42:3
**pyramids** [1] - 41:25

**Q**

**quarter** [3] - 16:19, 16:22, 17:1
**quarterly** [2] - 16:13, 16:14
**questioned** [1] - 32:22
**questions** [10] - 25:3, 27:16, 28:7, 35:10, 35:24, 37:6, 40:21, 40:24, 47:2, 47:3
**quick** [1] - 33:12
**quicker** [1] - 51:14
**quite** [1] - 51:6
**quo** [2] - 40:4, 40:17

**R**

**R2R** [1] - 40:2
**raise** [1] - 12:12
**raised** [2] - 12:22, 27:8
**rare** [1] - 7:11
**rate** [2] - 13:3, 17:6
**ratio** [2] - 18:7, 26:21
**read** [2] - 33:16, 47:9
**real** [1] - 16:4
**really** [6] - 14:4, 31:9, 45:25, 48:6, 48:17, 52:1
**reason** [3] - 9:4, 26:3, 43:18
**reasonable** [1] - 50:22
**receive** [4] - 12:25, 18:13, 21:24, 50:18
**received** [2] - 20:17, 23:1
**recess** [1] - 27:21
**recognize** [2] - 12:9, 21:7
**Recognizing** [1] - 12:11
**recollection** [1] - 7:23
**record** [1] - 33:16
**records** [1] - 39:21
**RECROSS** [1] - 46:7
**Recross** [1] - 3:6
**REDIRECT** [1] - 41:1
**Redirect** [2] - 3:6, 40:22
**redirect** [1] - 46:5
**reduce** [2] - 12:12, 36:17

**reduced** [2] - 12:14, 20:12
**reduction** [5] - 36:10, 36:13, 36:15, 37:2, 44:19
**reference** [4] - 6:12, 31:3, 33:13, 33:20
**referenced** [1] - 33:23
**referred** [4] - 5:23, 8:25, 11:20, 30:4
**reflect** [3] - 8:18, 15:3, 38:1
**reflected** [1] - 42:3
**regard** [6] - 7:6, 26:15, 27:10, 34:10, 34:11, 34:14
**regarding** [3] - 19:8, 19:11, 25:5
**regular** [1] - 27:5
**regularity** [1] - 50:6
**regulation** [9] - 11:21, 31:3, 31:8, 43:17, 47:24, 48:4, 48:17, 49:9, 52:2
**regulations** [1] - 32:8
**regulatory** [6] - 12:8, 12:18, 12:23, 31:14, 32:6, 32:7
**reinstate** [1] - 40:17
**reinstatement** [1] - 40:4
**relative** [1] - 15:25
**relevant** [1] - 48:23
**religious** [2] - 6:5, 9:10
**remaining** [2] - 14:18, 14:20
**remains** [1] - 45:3
**remedy** [1] - 40:4
**remember** [1] - 7:12
**remodels** [1] - 44:20
**renamed** [1] - 10:8
**rendered** [1] - 41:4
**Renton** [2] - 28:5, 50:9
**repeat** [1] - 30:10
**replace** [1] - 15:13
**replacement** [5] - 17:9, 17:11, 18:7, 26:21, 43:5
**report** [1] - 45:21
**representatives** [2] - 20:22, 26:9
**represented** [2] - 28:19, 28:20
**represents** [2] - 15:13, 42:17
**request** [1] - 48:1
**require** [1] - 44:7
**required** [6] - 11:23, 26:2, 43:20, 45:21,

46:11, 52:3
**resource** [1] - 30:14
**resources** [2] - 4:18, 20:23
**respond** [2] - 21:14, 22:4
**response** [4] - 7:25, 31:14, 34:4, 39:15
**responsible** [1] - 35:7
**responsive** [2] - 43:12, 43:13
**result** [5] - 12:17, 31:8, 33:7, 36:1, 38:25
**resultant** [1] - 44:13
**resulted** [1] - 43:18
**results** [2] - 14:25, 39:2
**retire** [1] - 11:1
**retirement** [47] - 5:10, 5:13, 5:21, 6:3, 7:6, 9:12, 10:13, 10:15, 10:18, 13:8, 15:4, 15:6, 15:9, 16:24, 17:2, 18:19, 20:17, 20:23, 25:6, 25:9, 26:4, 26:19, 26:21, 26:24, 26:25, 27:2, 27:4, 28:8, 29:13, 30:3, 30:5, 30:18, 34:6, 34:21, 38:2, 38:5, 38:7, 38:25, 39:10, 41:3, 46:12, 46:14, 46:16, 46:20, 46:24, 46:25, 47:13
**Retirement** [3] - 5:25, 6:1, 15:5
**retirements** [1] - 4:24
**return** [3] - 16:20, 17:13, 17:15
**returns** [1] - 17:10
**Revenue** [1] - 8:23
**review** [1] - 33:12
**reviewed** [1] - 27:4
**Road-2-Retirement** [1] - 16:4
**Roberts** [11] - 3:5, 3:6, 6:12, 21:8, 21:16, 35:10, 37:6, 48:22, 49:10, 49:24, 50:19
**ROBERTS** [18] - 21:10, 22:3, 24:1, 24:23, 25:1, 27:19, 28:2, 29:12, 30:3, 40:21, 46:8, 47:2, 47:21, 48:12, 48:19, 51:4, 51:9, 51:13
**Roger** [4] - 37:10, 37:17, 38:17, 39:6
**Roger's** [1] - 37:12

role [2] - 7:5, 48:18
round [1] - 28:11
rounding [1] - 12:9
Rule [5] - 10:24, 13:5, 13:7, 35:14, 35:17
run [4] - 21:3, 21:15, 22:19, 51:11

**S**

safety [1] - 4:25
salary [4] - 15:19, 18:8, 24:7, 24:18
Sally [1] - 13:25
savings [1] - 8:24
saw [2] - 16:19, 17:12
scan [1] - 21:17
scenarios [1] - 43:1
screen [1] - 40:1
second [2] - 14:22, 14:23
section [1] - 14:22
Security [1] - 18:17
see [10] - 8:8, 8:11, 17:10, 17:13, 24:16, 33:23, 35:11, 37:1, 37:5, 37:13
seeing [1] - 46:2
Select [1] - 14:5
self [1] - 17:10
self-directed [1] - 17:10
send [1] - 21:17
sense [3] - 47:10, 51:21, 52:16
sensing [1] - 47:25
Service [4] - 42:14, 43:5, 45:6
service [8] - 13:9, 18:2, 18:16, 20:22, 24:14, 42:18, 42:21, 43:4
Services [1] - 5:3
set [1] - 16:2
settings [1] - 28:16
seven [1] - 52:10
several [1] - 28:14
shakes [1] - 7:17
shares [1] - 12:13
sharing [1] - 6:6
sheet [10] - 12:1, 12:6, 12:10, 12:11, 16:8, 19:8, 19:11, 23:7, 26:13, 44:12
sheets [4] - 15:23, 21:20, 22:18, 22:21
ship [1] - 52:9
shopping [1] - 50:4
short [1] - 7:23
shot [1] - 40:1

show [2] - 14:20, 44:12
side [4] - 15:5, 15:9, 23:3, 50:5
sides [1] - 52:10
sit [3] - 30:21, 30:22, 50:24
site [1] - 8:23
sitting [1] - 47:19
situation [1] - 34:20
skills [1] - 52:6
Skipping [1] - 14:12
snapshot [2] - 18:22, 26:18
Social [1] - 18:17
solution [1] - 51:14
sometimes [2] - 7:9, 47:6
somewhat [1] - 52:5
somewhere [3] - 7:4, 50:7, 50:11
sorry [4] - 14:21, 40:12, 41:21
sort [1] - 49:7
specific [1] - 29:11
specifically [1] - 46:11
spend [1] - 37:7
spousal [2] - 20:11, 20:14
spring [3] - 41:10, 41:13, 41:17
staff [1] - 30:22
staffed [1] - 20:20
stand [2] - 27:23, 47:19
standard [5] - 32:2, 32:3, 32:5, 33:7, 33:13
Standards [3] - 11:22, 31:21, 31:22
standards [2] - 33:21, 35:16
start [2] - 11:19, 29:17
started [1] - 49:13
state [3] - 21:10, 32:3, 32:4
State [1] - 4:7
statement [3] - 11:25, 12:6, 16:13
statements [1] - 19:10
states [4] - 6:12, 6:13, 6:16, 28:14
status [2] - 40:4, 40:17
statute [1] - 32:3
stay [4] - 17:8, 50:9, 50:11
stayed [1] - 18:11
staying [1] - 50:7

still [7] - 18:9, 30:7, 44:24, 45:2, 49:16, 50:13, 52:18
stock [1] - 17:6
stocks [1] - 10:1
stop [1] - 43:2
stopper [1] - 45:20
strikes [1] - 50:13
subcommittee [2] - 30:16, 30:20
subject [5] - 30:8, 34:21, 37:17, 38:24, 39:10
submit [1] - 51:16
subsequent [1] - 45:17
substance [1] - 14:13
substantially [1] - 12:16
suffered [1] - 38:24
suggest [2] - 50:15, 50:18
suggestion [1] - 51:22
sum [4] - 10:25, 19:15, 19:20, 19:24
summarize [4] - 4:15, 10:18, 11:10, 11:16
summary [3] - 14:19, 14:25, 16:8
support [1] - 30:22
suppressed [1] - 12:15
surprise [2] - 47:22, 48:2
sustain [3] - 29:10, 34:2, 40:19
sworn [1] - 4:5
system [4] - 4:24, 7:5, 20:16, 20:23

**T**

tab [1] - 33:9
tables [2] - 20:2, 36:19
talks [1] - 52:1
tax [5] - 11:23, 12:7, 12:12, 42:11
Tax [2] - 8:11, 8:16
team [1] - 20:22
technical [1] - 5:24
Technically [1] - 8:22
ten [1] - 18:16
tend [1] - 50:11
tenth [1] - 23:8
terms [4] - 13:16, 21:21, 28:7, 46:11
Terry [1] - 23:23
testified [4] - 4:5, 20:11, 31:5, 50:17
testify [1] - 48:21

testimony [19] - 3:12, 13:13, 19:7, 25:5, 27:10, 27:12, 28:4, 34:7, 37:16, 38:23, 39:1, 39:16, 46:4, 48:25, 49:15, 50:21, 50:23, 51:25, 52:9
THE [121] - 4:7, 4:8, 4:9, 4:10, 4:11, 6:15, 6:20, 6:21, 6:22, 6:24, 9:2, 9:6, 9:8, 9:19, 9:22, 9:25, 10:1, 10:4, 10:5, 10:6, 10:11, 10:12, 16:9, 16:11, 16:12, 16:17, 16:23, 16:24, 17:3, 17:4, 17:5, 17:8, 17:17, 21:14, 21:24, 22:4, 22:11, 22:13, 22:14, 22:16, 23:1, 23:17, 23:20, 23:24, 24:22, 24:24, 25:3, 27:17, 27:20, 27:22, 29:10, 29:24, 30:4, 30:8, 31:10, 31:12, 31:13, 32:17, 32:19, 32:20, 33:18, 33:24, 34:2, 34:13, 34:14, 34:16, 34:17, 34:19, 34:24, 35:3, 35:6, 35:9, 35:18, 35:19, 35:21, 35:23, 36:1, 36:4, 36:5, 37:3, 37:4, 37:5, 38:12, 38:14, 38:15, 40:14, 40:19, 40:22, 41:22, 42:5, 42:9, 43:8, 43:9, 43:10, 43:12, 43:15, 43:20, 43:22, 44:15, 44:16, 44:22, 44:24, 45:24, 46:17, 47:3, 47:8, 47:16, 47:17, 47:18, 47:25, 48:13, 49:2, 49:15, 50:22, 51:5, 51:11, 51:19, 51:24, 52:8, 52:17, 52:25
themselves [3] - 16:1, 16:5, 16:7
thereafter [1] - 45:16
thinking [1] - 9:2
thinks [1] - 50:19
THOMAS [1] - 4:3
Thomas [1] - 4:8
thoughts [1] - 27:10
three [1] - 50:6
thrill [1] - 50:3
Timber [1] - 14:5
today [3] - 11:20, 21:2, 48:19

together [1] - 13:9
toll [1] - 20:20
TOM [1] - 3:4
took [1] - 18:22
Tool [1] - 3:10
total [2] - 15:12, 48:15
track [1] - 18:6
traditional [5] - 10:21, 36:6, 36:11, 36:25, 42:20
traffic [1] - 50:8
transcript [2] - 50:16, 50:18
transition [8] - 18:4, 18:9, 18:14, 18:15, 18:21, 19:3, 24:12, 24:14
Transition [1] - 18:5
triangle [1] - 41:20
true [2] - 20:4, 44:9
trying [2] - 51:9, 51:13
turn [1] - 8:8
turning [1] - 11:8
Turning [5] - 14:9, 16:8, 17:18, 23:7, 26:12
two [6] - 13:11, 14:17, 16:6, 17:1, 26:20, 33:4
two-minute [1] - 16:6
type [4] - 28:7, 32:23, 36:7, 45:7

**U**

ultimate [1] - 48:6
under [23] - 15:10, 17:22, 23:10, 23:12, 35:13, 36:2, 36:22, 37:19, 38:1, 38:3, 39:7, 41:14, 42:16, 42:19, 42:24, 42:25, 43:1, 43:4, 43:6, 43:14, 45:21
Under [3] - 5:16, 23:3, 43:2
understood [1] - 19:11
underwritten [1] - 8:17
unfunded [5] - 11:24, 39:11, 45:2, 45:10, 45:20
Unfunded [1] - 39:12
Union [4] - 8:8, 14:10, 22:22, 26:12
union [4] - 22:20, 28:16, 52:13
Union's [1] - 3:12
unit [1] - 7:19

**up** [9] - 9:17, 21:25, 36:18, 42:23, 43:22, 47:19, 48:15, 50:9, 51:11
**update** [1] - 21:3

# V

**vague** [2] - 29:8, 29:23
**Value** [2] - 9:1, 10:9
**value** [18] - 9:15, 9:16, 9:17, 9:23, 10:2, 11:2, 13:13, 13:15, 13:19, 14:6, 16:14, 19:21, 19:22, 26:23, 44:1, 44:4, 44:11
**values** [2] - 10:10, 10:12
**variance** [3] - 44:10, 44:13, 44:14
**vary** [1] - 39:2
**versus** [2] - 21:22, 24:18
**viability** [1] - 12:16
**view** [3] - 26:18, 49:7, 50:14
**visited** [1] - 50:4
**vowed** [1] - 6:5

# W

**wage** [1] - 18:18
**walk** [1] - 41:19
**Washington** [1] - 32:4
**wasting** [1] - 33:15
**website** [2] - 16:4, 30:24
**weigh** [2] - 49:4, 49:6
**whole** [2] - 45:1, 49:4
**window** [4] - 13:21, 13:22, 13:23, 13:25
**WITNESS** [36] - 3:3, 4:8, 4:10, 6:21, 6:24, 9:6, 9:25, 10:4, 10:6, 10:12, 16:11, 16:17, 16:24, 17:4, 17:8, 22:13, 22:16, 31:12, 32:19, 34:14, 34:17, 34:24, 35:6, 35:18, 35:21, 36:1, 36:5, 37:4, 38:14, 42:9, 43:9, 43:12, 43:20, 44:16, 44:24, 47:17
**witness** [5] - 21:21, 22:10, 35:22, 48:20, 50:17
**Witness** [2] - 4:4, 7:17
**witnesses** [1] - 33:16
**wondering** [1] - 32:15
**words** [2] - 20:5, 36:16

**workers** [1] - 5:1
**worth** [3] - 19:24, 19:25, 20:1
**write** [2] - 32:25, 52:18
**wrote** [1] - 35:14

# Y

**year** [16] - 17:1, 19:24, 19:25, 23:6, 27:2, 30:6, 36:18, 41:10, 42:18, 44:3, 45:9, 45:15, 45:17, 50:7
**years** [19] - 4:21, 5:6, 5:11, 5:12, 5:20, 7:2, 10:18, 10:20, 11:4, 11:6, 18:1, 18:16, 24:14, 26:20, 27:3, 29:19, 33:4, 36:8, 42:21
**yesterday** [1] - 21:12

*February 21 2017*

# COHENMILSTEIN

PRACTICE AREA:   EMPLOYEE BENEFITS / ERISA

# Providence Settlement

## PROVIDENCE HEALTH & SERVICES SETTLEMENT

Welcome to the Providence Health & Services ("Providence") Settlement website. This website is designed to keep class members informed regarding the Class Action Settlement in *Griffith v. Providence Health & Services*. While the District Court has approved the Notice of Proposed Settlement and ordered that certain documents filed with the Court be posted on this website, the content of this website is the responsibility of Plaintiffs' Class Counsel, and has not been approved by the Court.

# Background

On November 7, 2014, a putative class action complaint was filed against Providence and various other defendants alleging violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Court has appointed Keller Rohrback L.L.P. and Cohen Milstein Sellers & Toll, PLLC as Class Counsel.

The Complaint alleged that Defendants denied the Plan's participants and beneficiaries the protections of ERISA by claiming that the Providence Health & Services Cash Balance Retirement Plan ("Plan"), also known as the Core Plan, qualified as an ERISA exempt "church plan." The Complaint alleged that the Plan sponsored by Providence—a large, non-profit healthcare provider—did not qualify as an ERISA-exempt church plan.

Defendants moved to dismiss the Complaint on January 26, 2015. The Parties submitted briefs and documents regarding Defendants' motion.  While the motion to dismiss briefing was in progress, the Parties engaged in informal discovery.  Plaintiffs propounded discovery requests on Defendants and Defendants produced approximately 2,100 pages of documents in response to those requests.

Also, while the motion to dismiss was pending, the Parties agreed to stay further proceedings pending the result of a similar case pending in the Ninth Circuit Court of Appeals, *Rollins v. Dignity Health*, No. 13-01450 (N.D. Cal.). That case is now pending before the Supreme Court.

The Parties stipulated to stay the case while the Parties engaged in extensive settlement negotiations that took place over the course of many weeks and were overseen by a third party JAMS mediator. After weeks of negotiations, the Parties reached an agreement in principle to settle the case and on September 29, 2016, the Parties filed a status report informing the Court they had signed a Term Sheet containing the preliminary terms resolving this matter. They requested that the Court lift the stay in order to carry out settlement approval proceedings, which the Court granted on September 29, 2016.

# The Settlement Class

On December 6, 2016, the Honorable John C. Coughenour granted the <u>Preliminary Approval Order</u> of the ERISA Settlement on behalf of the following:

> All Persons who are or were participants, whether vested or non-vested, in the Plan, on or after January 1, 2008, and their beneficiaries.

*The Settlement provides specific benefits to two groups of people. These groups do not overlap. If you are covered by the Settlement, you can only be in one of the groups. Members of Group II, described below, will receive an additional enclosure with their Class Notice informing them that they are in Group II.*

## GROUP I: Current Participants and Beneficiaries in the Plan

For active participants and inactive participants with a deferred vested benefit in the Plan, and their beneficiaries, the Settlement provides a cash contribution of $350 million over seven years to the Plan, which will be used to pay retirement benefits to Plan participants and beneficiaries that are or will become eligible to receive benefits and Plan expenses. The Settlement also provides significant financial and administrative protections, described in more detail below under the section called "The Settlement."

## GROUP II: Persons Who Were Credited with More than Three Years of Vesting Service, But Less Than Five Years of Vesting Service

The Plan requires that a participant be credited with five years of "vesting service" in order to be 100% vested in the Plan. However, ERISA requires that participants in a cash balance plan be 100% vested after three years of vesting service. Pursuant to the Settlement, Plan participants who had a break in covered service under the Plan on or after January 1, 2008 and who, as of the break in service, were credited with at least three (3) years of vesting service, but less than five (5) years of vesting service, will receive a one-time lump sum payment of $500 each. Individuals who are in this Group II will receive an additional enclosure with the Class Notice informing them that they are in Group II.

*Group II*

# The Settlement

As described in detail below, the monetary consideration provided under this <u>Settlement</u> is substantial, totaling **$351.901 million**. The Settlement also includes significant non-monetary equitable consideration, in that participants in the Plan will receive certain ERISA-like financial and administrative protections. The benefits provided by the Settlement are as follows:

## <u>Benefits for Members of Group I</u>

The Settlement requires a cash contribution of $350 million to the Plan, over a seven year period, to settle the claims against Defendants. This payment will be made by annual contributions to the Plan for seven years. In addition to these payments, the Settlement provides that, beginning eight years after the Effective Date, Providence will make annual minimum contributions to the Plan as recommended by the Plan's actuary with the intent to fully fund the Plan by December 31, 2029. Because the Plan is a defined benefit pension plan and not a defined contribution plan, like a 403(b) plan with individual accounts, the ***cash amount will be contributed to the Plan as a whole***, rather than to individual Plan participants and beneficiaries.

*Does not improve benefit accrual to beneficiaries.*
*~~Does not~~ Should bring in Fiduciary Relation require under*
*ERISA to protect beneficiaries. "Prudent person" to IRC*

43509

| | inflation | New CPI+1 max 4% | | Old CPI+3 No cap | |
|---|---|---|---|---|---|
| 2009 | .4 | 1.4 | 50000 | 3.4 | 50000 |
| 2010 | 1.6 | 2.6 | 51300 | 4.6 | 52300 |
| 2011 | 3.2 | 4.0 | 53352 | 6.2 | 55543 |
| 2012 | 2.1 | 3.1 | 55006 | 5.1 | 58375 |
| 2013 | 1.5 | 2.5 | 56381 | 4.5 | 61002 |
| 2014 | 1.6 | 2.6 | 57847 | 4.6 | 63808 |
| 2015 | .1 | 1.1 | 58483 | 3.1 | 65786 |
| 2016 | 1.3 | 2.3 | 59828 | 4.3 | 68615 |

```
  68615
  59828
 _____
  8787.
```

175.74 per thousand

Providence also guarantees that the Plan's trust will have sufficient funds to pay the vested benefits owed to participants under the terms of the Plan as they come due. Furthermore, no Plan amendment or termination may result in a reduction in a participant or beneficiary's accrued benefit. In the event of a merger with or into another plan, all participants and beneficiaries must receive the same (or greater) benefits as they enjoyed before the merger. These payments and commitments benefit the current participants in and beneficiaries under the Plan, including individuals who are currently receiving their benefits, described as **Group I** (see above under the section titled "The Settlement Class"). These commitments are crucial because, as it stands now, the Plan's promise to pay is "fund-specific," meaning that the Plan's financial responsibility for benefits is limited **solely** to the amount of assets held in the Plan's trust fund. Because of this Settlement, if the assets in the Plan's trust are ever insufficient to pay accrued benefits, Providence must make sufficient contributions to the trust to ensure all accrued benefits are paid.

Plan participants will also receive many other protections under this Settlement that are comparable to key ERISA provisions. For example, Plan participants will be entitled to summary plan descriptions ("SPDs") describing the Plan, summaries of any material modifications to the Plan, pension benefit statements, and claims procedures. Plan participants and beneficiaries may also request annual reports containing financial information about the Plan.

## Benefits for Members of Group II

The Settlement also provides that within thirty days after the Effective Date of the Settlement, Providence will pay, pro rata, $1.901 million to the 3,802 non-vested former participants in the Plan who left covered service under the Plan after completing at least 3, but less than 5, years of vesting service and who, as a result, allegedly forfeited a benefit accrued under a cash balance formula. This group is labeled **Group II** (see above under the section titled "The Settlement Class"). Each member of Group II will receive $500, along with an enclosure attached to their Class Notice informing them that they are in Group II.

### Costs & Uncertainties of the Litigation

With this Settlement, the Court has not decided in favor of Named Plaintiffs or Defendants. Instead, Named Plaintiffs and Defendants have agreed to a settlement to resolve the Action. In reaching the Settlement, they have avoided the cost and time associated with continued litigation. As with any litigation, the Named Plaintiffs would face an uncertain outcome if this case proceeded, including the risk of dismissal of their case as well as the risk of not prevailing at trial. Indeed, the scope of the ERISA church plan exemption is currently being litigated in the U.S. Supreme Court. The uncertain outcome of the proceedings in the Supreme Court also raises risks for both parties in continuing this litigation. △ *in DOL under trump.*

### Released Claims

The Settlement Agreement generally defines the Released Claims as claims brought by Plaintiffs, or claims that could have been asserted by Plaintiffs, arising out of the allegations in the instant action. However, there is a significant carve out from the Released Claims. Namely, the Settlement Agreement provides that Defendants will not be released prospectively in the event of certain developments in the law, such as the Internal Revenue Service issuing a written ruling that the Plan does not qualify as a church plan. *If the law says the "Plan" is different, it will be. Not different now.*

*Our chance* ✶

### Fairness Hearing and Objections

The District Court has scheduled a hearing to evaluate the fairness and adequacy of the Settlement. At the Fairness Hearing, to be held on March 21, 2017, at 9:00 a.m. PST, the Court will consider Named Plaintiffs' request for final approval of the Settlement, for class certification, for an award of attorneys' fees and expenses, and for an Incentive Fee to Named Plaintiffs.

Any member of the Settlement Class who wishes to object to the fairness, reasonableness, or adequacy of the Settlement, to any term of the Settlement Agreement, to the application for payment of attorneys' fees and expenses, or to the application for an Incentive Fee for the Named Plaintiffs, may file an Objection in writing. All written objections and supporting papers must: (1) clearly identify the case name and number "Griffith, et al. v. Providence Health & Services, et al., Case No. 14-cv-01720-JCC;" (2) be filed with the Court and either postmarked and mailed or faxed to Class Counsel and Defendants' Counsel at the addresses in the <u>Class Notice</u> **on or before February 21, 2017 (twenty-eight (28) days before the Fairness Hearing)**; (3) set forth your full name, current address, and telephone number; (4) set forth a statement of the position you wish to assert, including the factual and legal grounds for the position; (5) set forth the names and a summary of testimony of any witnesses that you might want to call in connection with the Objection; (6) provide copies of all documents that you wish to submit in support of his/her position; (7) provide the name(s), address(es) and phone number(s) of any attorney(s) representing you; and (8) state the name, court, and docket number of any class action litigation in which you and/or your attorney(s) has previously appeared as an objector or provided legal assistance with respect to an objection; and (9) include your signature.

**Your written objection must be filed with the Court, and mailed or faxed to the counsel listed in the <u>Class Notice</u> by no later than February 21, 2017.**

# Settlement FAQs

**Q: How do I know whether I am part of the Settlement Class?**
The Court has certified the Action as a class action. You are a member of the Settlement Class if you are or were a participant (whether vested or non-vested), or a beneficiary of a participant, in the Providence Health & Services Cash Balance Retirement Plan on or after January 1, 2008.

**Q: What does the Settlement provide?**
Under the Settlement, Providence is required to make a $350 million cash contribution to the Plan. This contribution will be made over the course of seven years. The first payment of $50 million will be made thirty days after the Order approving the Settlement becomes final and non-appealable and all other conditions to the Settlement have been satisfied (the "Effective Date"). For the next six years, Providence will make annual payments of $50 million in each calendar year. Beginning eight years after the Effective Date and continuing thereafter as long as the Plan has not been terminated, Providence will also make annual minimum contributions to the Plan as recommended by the Plan's enrolled actuary with the intent to fully fund the Plan by December 31, 2029.

Providence guarantees that the Plan's trust will have sufficient funds to pay participants' vested benefits under the terms of the Plan as they are due. The Settlement additionally provides that, if the Plan is ever merged with or into another plan, participants and beneficiaries in all affected plans will be entitled to the same (or greater) accrued benefits as they enjoyed before the event. Furthermore, the accrued benefits of participants and beneficiaries cannot be reduced if the Plan is ever amended or terminated.

In addition to the payments above, within thirty days after the Effective Date, Providence will pay $1.901 million in the aggregate ($500 per person) to the 3,802 former participants in the Plan who had a break in covered service under the Plan on or after January 1, 2008 and who, as of the break in service, were credited with at least three, but less than five, years of vesting service, and who allegedly forfeited an accrued benefit ("Group II"). These individuals will receive an additional enclosure with the Class Notice informing them that they are in Group II, and the lump sum payment of $500 will be mailed to each person's last known address.

Need the average balance of the
opt-in "Frozen Core Plan" and # of
employee eligible to the Plan for
1/1/10.

CPI + 3%
from 1/1/10 to date on principal only

CPI + 1% max 4%
from 1/1/10 to date on 1% only.

yrs. of service employee breakdown

⓪ 5% before 12/31/09

1/1/10 → 3%

5%

6%

The Settlement also provides significant non-monetary equitable consideration, in that participants and beneficiaries in the Plan will receive certain ERISA-like protections concerning plan administration, summary plan descriptions, summaries of material modifications to the Plan, notices (pension benefit statements, annual reports), and the Plan's claims review procedure.

The above description of the operation of the Settlement is only a summary. The governing provisions are set forth in the Settlement Agreement.

**Q: How will the Settlement be distributed?**
Members of the Settlement Class do not need to do anything with respect to the Settlement in this Action. Thirty (30) days after the Effective Date of the Settlement, Providence will make the first payment of $50 million into the Plan, and will continue making contributions over the course of seven years which will, in total, amount to a $350 million contribution to the Plan for the benefit of members in Group I.

Providence, through its claims administrator, Rust Consulting, will also issue checks to members of Group II, who are not current participants in the Plan and who meet the criteria described above under the heading "The Settlement Class", within thirty (30) days after the Effective Date of this Settlement.

For more information about these payments, see the Class Notice.

**Q: Can I exclude myself from the Settlement?**
You do not have the right to exclude yourself from the Settlement. For settlement purposes, the Action was preliminarily certified under Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) (non-opt- out class) because the Court determined the requirements of that rule were satisfied. Thus, it is not possible for any of the members of the Settlement Class to exclude themselves from the Settlement. As a member of the Settlement Class, you will be bound by any judgments or orders that are entered in the Action for all claims that were or could have been asserted in the Action against the Defendants or are otherwise included in the release under the Settlement.

Although members of the Settlement Class cannot opt-out of the Settlement, they can object to the Settlement and ask the Court not to approve the Settlement.

**Q: How will the lawyers be paid?**
At the Fairness Hearing, Class Counsel will apply for an award of attorneys' fees and expenses. The application for attorneys' fees will not exceed $6.5 million for attorneys' fees and expenses and Incentive Fees to the Named Plaintiffs. **The attorneys' fees are separate from the $350 million contribution to the Plan and the $500 payment to each of the individuals in Group II—the attorneys' fees will not reduce these amounts.**

To date, Class Counsel has not received any payment for their services in prosecuting this Action on behalf of the Settlement Class, nor have Class Counsel been reimbursed for their out-of-pocket expenses. The fee requested by Class Counsel would compensate all of Plaintiffs' counsel for their efforts in achieving the Settlement for the benefit of the Settlement Class and for their risk in undertaking this representation on a contingency basis. The Court will determine the actual amount of the award.

# Contact

For inquiries re this Settlement, please email: ProvidenceSettlement@kellerrohrback.com.

Billions of dollars in growth of capital.

The unilateral Plans changes help support the expansion at Providence Health & Services. Swedish, Saint Joes' & Medical acute clinic. Build major hospital & organization infractuctures from Alaska to California.

You may also contact Class Counsel at (800) 233-8509.

If you are a Class Member and you have questions regarding the Group to which you belong, please contact Rust Consulting at (866) 317-3194.

## CASE DOCUMENTS

Class Notice - January 19, 2017

Complaint - November 7, 2014

Motion for Preliminary Approval - October 20, 2016

Declaration in Support of Preliminary Approval - October 20, 2016

Preliminary Approval Order - December 6, 2016

Settlement Agreement - October 20, 2016

## RELATED PROFESSIONALS

Karen L. Handorf

Julie G. Reiser

Michelle C. Yau

Mary J. Bortscheller

© 2016 Cohen Milstein Sellers & Toll PLLC. All rights reserved.

Wonder if Schutter would like
to jump into the pond w/ me.?

Providence has abused it protection
under the "Church Plan" — 4+ retirement
plans in last 20+ years. Hiding disclosures
and unilateral changes from its beneficiaries

Providence admitted it wanted to change.
Retirement Plan to free up capital —
Union Arbitration — FSB 158 present by
Paula Lehman . . . .

Providence wrote off millions of $
of Liability in Financial Statements to
further support its interest in the
organization and not its fiduciary
responsiblities under ERISA.

Thousands of participants have lost
already accrued benefits which should
only have been granted by a Federal
Bankruptcy Court.

Providence is financially sound + strong.
Since 2009, Providence has grown from a
to 12 HealthCare system to the #3 system.



**PROVIDENCE**
Health & Services

# Your Personalized Retirement Projection Statement

88 Providence Mount St. Vincent    24082

21900 T73 *****AUTO**5-DIGIT 98136
PATRICK PETERSEN
4306 SW JUNEAU ST # 12
SEATTLE, WA 98136-1458

Dear PATRICK PETERSEN,

You are an important part of our team. We recognize and appreciate your commitment to helping us meet the needs of others. Likewise, we are committed to recognizing your service and providing a retirement program that will help you save for retirement.

As you know, Providence announced changes to the retirement program that will take effect January 1, 2010. The changes are intended to help protect your existing retirement benefits and stabilize the financial health of our ministry into the future. What hasn't changed is our commitment to recognize employees who have dedicated their careers to advancing our ministry.

***This statement has been prepared to help you understand how the new retirement program works and how the changes may affect you personally. We encourage you to read this statement carefully.***

If you have general questions about the new retirement program, please contact your local Human Resources department or benefits representative. For specific program or detailed personal questions, please contact our retirement program specialists using the contact information listed on the back page of this statement.

Thank you for all that you do every day for our ministries and for those entrusted to us for their care.

## What's Changing?
Starting January 1, 2010:

- ***The Core Plan will be frozen.*** The money in your account as of December 31, 2009 remains in your name and will not go away.

- ***We are adding a new plan, the 401(a) Service Plan, with annual contributions from Providence.*** Each year, Providence expects to make contributions to your new Service Plan account based on your total annual pay and your years of service.

- ***We are introducing a simplified list of investment options for the Providence savings plans.*** We're revising our investment options to focus on mutual funds with a strong track record — including socially-responsible and target date funds. More information about this change and what you need to do will be provided in the coming months.

## YOUR PERSONAL DATA

This statement was created based on the data that we currently have on record, as displayed below. If you have any questions about this data, please contact the System Retirement Office toll-free at (866) 776-8727, option 1.

| | |
|---|---:|
| Date of Birth: | 10/21/1957 |
| Estimated 2010 Retirement Eligible Compensation: | $46,264 |
| As of January 1, 2010, your total Core Plan vesting service is expected to be: | 3 years |

## How the Core Plan Works Today

The Core Plan is an account-based cash balance plan that's funded 100% by Providence. Currently, you receive annual pay credits and monthly interest credits that build value over time. A Minimum Benefit of $25 per month times your years of Minimum Benefit service provides a floor pension benefit to all employees.

**Your Core Plan account balance as of January 1, 2009 was $3,187.**

## Vesting

Your account balance is vested as long as you have completed five years of service with Providence, with at least 800 hours during each year.

**As of January 1, 2009, you were not fully vested in the Core Plan. You are expected to vest in the Core Plan as of 07/01/2011.**

You immediately vest in your Core Plan benefit if you become totally and permanently disabled, die or turn age 65 while employed at Providence, even if you have less than five years of service.

Please visit the Road2Retirement Web site at **https://r2r.providence.org** or contact the System Retirement Office at (866) 776-8727 for more information regarding your Core Plan benefit including when your benefits are payable and your distribution options.

## What's Changing in the Core Plan

After the last 2009 pay credit is made to your account in the spring of 2010, Providence will no longer make pay credit contributions. Your cash balance account will remain intact. It will continue to grow with monthly interest credits from Providence as shown in the table below.

| Change to Interest Credit | |
| --- | --- |
| Under Current Program | Under New Program |
| Interest credits are calculated as the difference in the Consumer Price Index (CPI) plus 3%. | Interest credits will be calculated as 4% or the difference in the CPI plus 1%, whichever is less. |

The current vesting and distribution provisions will not change. If you are not yet vested in your Core Plan benefit, your hours of service with Providence after January 1, 2010 will also continue to count toward vesting for your frozen Core Plan account as before.

## What does this mean to me?

To see how your projected benefits under the current retirement program compare to your projected benefits from the new retirement program, see the chart on page 6.

## THE NEW SERVICE PLAN

### How Your Service Plan Benefit Grows

Starting January 1, 2010, we are adding a new plan that will replace the Core Plan. The new plan will be a defined contribution plan. With the new 401(a) Service Plan, Providence expects to contribute money to your account each year based on your years of service, as shown in the table below. You are eligible to receive an annual contribution from Providence if you work at least 1,000 hours each year and are considered actively employed at the end of the payroll year. The first Service Plan contributions will be made in spring 2011 based your 2010 eligibility.

| Service Plan Contribution Schedule | |
| --- | --- |
| Years of Benefit Service | Annual Contribution (Percentage of Pay) |
| 0 to 9 | 3% |
| 10 to 14 | 5% |
| 15 or more | 6% |

You will receive a minimum contribution of $1,250 to your account, even if it is more than 3%, 5% or 6% of your pay. This minimum benefit will be prorated if you work less than 2,000 hours, but more than 1,000 hours.

**Based on your projected years of service and pay as of January 1, 2010, the estimated contribution to your Service Plan account for 2010 will be $1,388.**

### Vesting

You are vested in your Service Plan account after you work five years with at least 1,000 hours during each year. The years of Core Plan vesting service you already have will count towards this requirement, so if you are already fully vested in the Core Plan you also will be fully vested in the Service Plan. You will immediately vest in your Service Plan benefits if you become disabled, die or turn age 65, even if you have less than five years of vesting service.

**As of January 1, 2010, you will not be fully vested in the new Service Plan. If you continue active employment with Providence, you are expected to be fully vested on 08/01/2011.**

### Investment Performance

Your new Service Plan account may also grow over time with investment earnings. You decide how to invest your account using the same investment options that are available under the Value Plan and bear the risk and the rewards of your investment choices. Your account balance will change based on Providence's contributions and how your investments perform over time.

We will be updating the Road2Retirement Web site periodically with more information about your Service Plan benefit.

### How Your Benefits Compare

The table below compares your estimated account balance under the current Core Plan to your estimated new total account balance from the frozen Core Plan and the Service Plan. Estimates payable before age 65 have been reduced to reflect early commencement. The Current Total and New Total below do not include your Value Plan account balance. The Change in Totals calculation reflects the total amount you are expected to receive from Providence. The calculation includes your projected Value Plan employer match and assumes you contribute enough to receive the maximum match.

| Age | Current Core Plan with No Changes | | Frozen Core Plan and Service Plan | | | Change in Totals*** |
| --- | --- | --- | --- | --- | --- | --- |
| | Core Plan | Current Total* | Frozen Core | Service Plan | New Total** | % Difference |
| Age 60 | $34,301 | $34,301 | $7,797 | $17,710 | $25,507 | 81% |
| Age 62 | $44,664 | $44,664 | $8,434 | $26,226 | $34,660 | 84% |
| Age 65 | $63,381 | $63,381 | $9,487 | $43,255 | $52,742 | 88% |

\*    The Current Total is your projected benefit from the Core Plan with no changes.
\*\*   The New Total is your combined projected benefit from the frozen Core Plan and new Service Plan.
\*\*\* The Change in Totals is calculated as the New Total plus projected employer match divided by the Current Total plus projected employer match.

The Value Plan is a retirement savings plan and is also known as a defined contribution plan. The Value Plan allows you to increase your retirement savings through payroll contributions and earn a matching contribution from Providence.

## Vesting

Eligible employees may participate in the Value Plan and receive the Providence matching contribution. You are immediately vested in the full amount of your Value Plan account — both your contributions and the matching contributions from Providence. That means when you leave or retire from Providence, you will be able to take the balance of your Value Plan account with you.

## How the Value Plan Benefit Grows

You may contribute from 1% to 75% of your pay up to the federal limit (up to $16,500 in 2009) on a before-tax basis. Employees age 50 or older are able to save up to $22,000 by making additional age-related catch-up contributions (up to $5,500 during 2009).

As an additional incentive to participate in the Value Plan, Providence makes a matching contribution up to a limit that increases with your years of match level service, as shown in the table below.

| If you have... | Providence matches |
|---|---|
| 0-4 years of service | Up to half of the first 3% of pay you save (1.5%) |
| 5-9 years of service | Up to half of the first 4.5% of pay you save (2.25%)* |
| 10 or more years of service | Up to half of the first 6% of pay you save (3%) |

* Since you can only contribute to the Value Plan in full percent increments, you must contribute 5% to receive the full matching contribution from Providence.

**As of March 14, 2009, you were contributing 4% to the Value Plan on a before-tax basis. As of January 1, 2009, your account balance was $2,296, which included $651 in matching contributions from Providence.**

## What's Changing in the Value Plan

Starting January 1, 2010, the only change to the Value Plan will be to the investment options. You will continue to receive the same matching contribution from Providence. The vesting, loan and distribution provisions will not change. You will also have access to even more investment planning tools and resources.

We have received feedback from employees like you over the years that with the number of investment choices available today, it can be difficult to know where to invest. Our goal is to create a stronger and simpler, yet diverse menu. We are revising the list of investment options to focus on funds with a strong track record — including socially-responsible and target date funds. We have also entered into discussions with our recordkeeper to add a mutual fund brokerage window to our savings plans, which allows you to openly trade mutual funds. This would enable you to keep any mutual funds not on our new investment option list should you wish to retain any of them.

Currently, an independent investment consulting firm is evaluating our alternatives. The Retirement Plan Investment Sub-committee (RPIS), a Board appointed committee responsible for the savings plan investment choices, will review the consultants' recommendations this summer and prepare the list of investments for approval by the Board of Directors.

As soon as the list is approved, we will provide more information, including a chart showing how current investment options will be replaced, or "mapped" to the new investment options. The current investment options will be mapped into options that have similar underlying investments and have historically performed better (although there can be no guarantee of future performance). You will have approximately 60 days from the time the mapping communication is received to modify your investment elections before the changes will be implemented on your behalf toward year-end.

## Investment Performance

As with the Service Plan, your Value Plan account may grow over time with investment earnings. You choose the investments for both your contributions and the Providence matching contribution amount. Because much of your retirement benefit will be coming from the Value Plan, your decisions about how much to save and how to invest your money are very important. Your benefit at retirement will depend on the contributions you and Providence make and the investment earnings on those contributions over the years.

Please visit the Road2Retirement Web site for more information about your Value Plan, including when your benefits are payable and your distribution options. Under *Program Information*, click on *Value Plan*.

## Need Help with Investment Planning?

Should you need help with investment planning, we have a number of investment planning tools and calculators available. The Investor Style Quiz on the Road2Retirement Web site can be a great place to start. It can help you identify your preferences for investing.

You can also talk with a Fidelity Retirement Counselor about investment and retirement planning in person or on the phone. You can schedule an appointment or sign up for an investment workshop under the *Library* section on the Road2Retirement Web site. Or, talk with a Fidelity Retirement Counselor over the phone by dialing the System Retirement Office at (866) 776-8727. Stay on the line and transfer to Fidelity. Identify yourself as a participant in a Providence plan, and ask to speak with a Fidelity Retirement Counselor.

## How Much You Contribute Makes a Difference

You can influence the amount of your retirement income by your level of participation in the Value Plan. We encourage you to take advantage of the value and flexibility that the plan offers.

Since you are already receiving the full match, you know the importance of saving early. Consider increasing your contributions to the Value Plan and focus on how your assets are invested. The graph below shows your potential savings in the Value Plan over time if you continue to save **4%** and if you increase your contributions to **6%**.



# YOUR PROJECTED RETIREMENT INCOME UNDER THE NEW PROGRAM

The chart below shows your estimated retirement income from the Core Plan, Value Plan and Service Plan under the new retirement program. For purposes of this projection, we have assumed that you will always contribute to your Value Plan account in order to maximize the matching contribution from Providence. The Value Plan amounts shown below include contributions from both you and Providence. Unlike the *Program Comparison Tool*, your current Value Plan account balance is included below.

**The estimates are based on the new retirement program effective January 1, 2010.**



At age 65, the percentage of your pre-retirement income that will be replaced when you retire is estimated to be 17%. To maintain your pre-retirement lifestyle, financial advisors generally recommend that your total annual retirement income from all sources be approximately 70%, or more, of your income at the time you retire. However, only you can estimate what your actual needs at retirement will be.

The estimated pre-retirement income above includes only your benefits from Providence. In order to reach your retirement income needs, you may need to increase your savings in the Value Plan. Additional sources of retirement income may supplement your retirement benefits from Providence, such as benefits from prior employers or other personal savings like an IRA.

In addition, you are estimated to receive $18,852 annually from Social Security if you retire at your Social Security Normal Retirement Age of 66 and 6 months. This estimated Social Security benefit is not reflected in your replacement ratio displayed above.

## To determine the estimates and projections shown in this statement, we have assumed:

- You will continue to work with Providence until the ages shown.
- You will continue to work the same hours that you worked in 2008.
- Your pay will increase by 3.0% each year.
- Your hours and pay have been annualized if you were newly hired in 2008 or 2009, which may over- or under-state your benefit projections. You may modify this assumption for your projection in the online *Program Comparison Tool* at **https://r2r.providence.org**.
- 3.0% annual increases in the National Average Wage Index.
- 3.0% annual increases in CPI and inflation.
- 3.0% annual increases on government limits applying to tax-qualified retirement plans.
- Your contribution to the Value Plan will increase over time to maximize the employer match for your years of service.
- You will not make withdrawals from your Value Plan account.
- You will not make catch-up contributions to your Value Plan account.
- You will earn a 6.5% annual rate of return on your Value Plan and Service Plan investments.
- A 5.5% conversion interest rate for converting account balances.
- Note that retirement projections shown on the *Program Comparison Tool* or other statements may have used different assumptions.

| Core Plan and Service Plan | Current Core Plan | Frozen Core Plan | Service Plan |
|---|---|---|---|
| | **Through December 31, 2009** | **Starting January 1, 2010** | |
| **Eligibility** | After one year of service in which you work at least 800 hours, Providence sets up a personal account in your name. | No new Core Plan accounts will be set up. **Your balance as of December 31, 2009 will remain intact.** | You are eligible if you work at least 1,000 hours each year. The first contributions are scheduled for spring 2011 based on hours worked in 2010. |
| **Contributions & Growth** | The cash balance account grows in two ways:<br><br>■ An annual pay credit of 5%.<br><br>■ A monthly interest credit that reflects the Consumer Price Index (CPI). The interest credit rate is the change in the CPI between the two years before the credit is made, plus an additional 3%.<br><br>A minimum benefit of $25 times years of service is provided at retirement if it provides a larger benefit than the cash balance formula. | Providence is stopping pay credits and changing the interest crediting rate.<br><br>■ After the last 2009 pay credit is made to your account in the spring of 2010, Providence will no longer make pay credit contributions.<br><br>■ Your account will continue to grow with monthly interest credits from Providence, calculated as the change in CPI plus 3%. | Each year, Providence expects to make an annual contribution based on your years of service, as follows:<br><br>■ With 0 to 9 years of service, you receive 3% of pay.<br><br>■ With 10 to 14 years of service, you receive 5% of pay.<br><br>■ With 15 or more years of service, you receive 6% of pay.<br><br>A minimum of $1,250 will be contributed, even if that is more than 3%, 5% or 6% of your pay. This minimum benefit will be prorated if you work less than 2,000 hours, but more than 1,000 hours.<br><br>You decide how to invest your account using the same investment options from the Value Plan. |
| **Vesting & Distribution** | You are vested in the Core Plan benefit after you work five years with at least 800 hours during each year. | Core Plan vesting and the options for distribution remain the same.<br><br>If you have not earned five years of vesting service by December 31, 2009, your hours of service under the new program will also count toward your vesting in the frozen Core Plan benefit. | You are vested after you work for Providence for five years with at least 1,000 hours during each year. Prior years of vesting service apply, so if you are already fully vested in the Core Plan then you are already fully vested in the Service Plan. |

## Value Plan

The only changes to the Value Plan are to the investment options. Providence will continue to make a matching contribution if you participate in the Value Plan. The vesting, loan and distribution options will not change.

## QUESTIONS?

Providence provides a wide variety of resources to support you during these changes and to help you plan for retirement.

The Road2Retirement Web site at **https://r2r.providence.org** is a comprehensive resource that you can access from home, work or any place with Internet access. The following resources and tools may be useful to you during these changes:

- *Program Comparison Tool*: View how your estimated benefits may be different at retirement based on these changes.
- *FAQ*: Find answers to your questions about the changes. If you can't find the answer, you can submit your question to the System Retirement Office.
- *Announcements*: Check here for the latest news and information about the changes to the Providence retirement program.

Retirement experts are available toll-free at (866) 776-8727.

Press or say "1" or "Providence" to reach the System Retirement Office. Specialists are available Monday through Friday, 8:00 a.m. - 5:00 p.m. PST and can assist with questions about:

- How the changes affect you personally.
- Changes to the retirement program.

OR

Stay on the line to be transferred to the Fidelity Customer Service Center. Representatives are available Monday through Friday, 5:00 a.m. - 9:00 p.m. PST and can assist with questions about:

- Current Value Plan investment options.
- Rebalancing your Value Plan account.
- Loans.
- Investment or retirement planning assistance.

*This statement is printed on recycled paper that is Forest Stewardship Council (FSC) certified. FSC is the only certification that ensures that timber products come from forests that have been managed in an environmentally and socially responsible way.*

*Providence retirement plans are governed by the Internal Revenue Code, and other state and federal laws. This statement is not intended to provide you with financial, tax or legal advice. You should consult with your own advisor for specific advice regarding these matters. While every effort has been taken to give you accurate figures and estimates, the possibility of error does exist. Projected benefit amounts are estimates only and do not constitute a promise of specific benefits or of continued employment. Projections are based upon data available at this time and on certain assumptions noted on page 6 of this statement. Should data inputs or plan benefit interpretations need to be revised, actual benefit amounts may differ. If actual experience differs in any way from these assumptions, actual benefit amounts under both programs could be affected, either upward or downward.*

*Complete details of the Providence retirement plans are included in the official plan documents. If there is any difference between the information presented in this statement and the official plan documents, the plan documents will govern. This statement does not constitute an employment contract, nor does it provide a guarantee of future employment. Providence reserves the right to amend, modify or terminate any of the plans in any manner in whole or in part, at any time.*



**Retirement Service Center**
**(866) 776-8727, option 1**

PATRICK PETERSEN
9630 315TH AVE SE
ISSAQUAH WA 98027
88 - Providence Mount St. Vincent

## 2009 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---:|
| Beginning Account Balance as of December 31, 2008 | $3,187 |
| Providence Annual Pay Credit for 2009 | $2,865 |
|         Eligible Pay: $57,315.26    **Crediting Rate:** 5.00% | |
|         Interest Credited through December 31, 2009 at 0.00% | $264 |
| Ending Account Balance as of January 1, 2010* | $6,317 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 0% |
| **Vested Account Balance as of January 1, 2010** | **$0** |

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest and pay credits may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.



**Retirement Service Center**
**(866) 776-8727, option 1**

**PATRICK PETERSEN**
**9630 315TH AVE SE**
**ISSAQUAH WA 98027**
**88 - Providence Mount St. Vincent**

## 2010 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---|
| Beginning Account Balance as of December 31, 2009 | $6,317 |
|         Interest Credited through December 31, 2010 at 1.00% | $63 |
| Ending Account Balance as of January 1, 2011* | $6,380 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 0% |
| **Vested Account Balance as of January 1, 2011** | **$0** |

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.



**Retirement Service Center**
**(866) 776-8727, option 1**

**PATRICK PETERSEN**
**9630 315TH AVE SE**
**ISSAQUAH WA 98027**
**88 - Providence Mount St. Vincent**

## 2011 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---:|
| Beginning Account Balance as of December 31, 2010 | $6,380 |
| Interest Credited through December 31, 2011 at 2.18% | $139 |
| Ending Account Balance as of January 1, 2012* | $6,611 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 100% |
| **Vested Account Balance as of January 1, 2012** | **$6,611** |

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.


**Retirement Service Center**
**(866) 776-8727, option 1**

PATRICK PETERSEN
9630 315TH AVE SE
ISSAQUAH WA 98027
88 - Providence Mount St. Vincent

## 2012 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---:|
| Beginning Account Balance as of December 31, 2011 | $6,519 |
| Interest Credited through December 31, 2012 at 4.00% | $260 |
| Ending Account Balance as of January 1, 2013* | $6,780 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 100% |
| **Vested Account Balance as of January 1, 2013** | **$6,780** |

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.


**Retirement Service Center**
**(866) 776-8727, option 1**

PATRICK PETERSEN
9630 315TH AVE SE
ISSAQUAH WA 98027
88 - Providence Mount St. Vincent

## 2013 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---:|
| Beginning Account Balance as of December 31, 2012 | $6,780 |
| Interest Credited through December 31, 2013 at 2.70% | $183 |
| Ending Account Balance as of January 1, 2014* | $6,963 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 100% |
| **Vested Account Balance as of January 1, 2014** | **$6,963** |

---

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

---

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

---

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.



**Retirement Service Center**
**(866) 776-8727, option 1**

PATRICK PETERSEN
9630 315TH AVE SE
ISSAQUAH WA 98027
88 - Providence Mount St. Vincent

## 2014 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---|
| Beginning Account Balance as of December 31, 2013 | $6,963 |
| Interest Credited through December 31, 2014 at 2.55% | $177 |
| Ending Account Balance as of January 1, 2015* | $7,141 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 100% |
| **Vested Account Balance as of January 1, 2015** | **$7,141** |

---

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

---

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

---

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.



**Retirement Service Center**
**(866) 776-8727, option 1**

PATRICK PETERSEN
9630 315TH AVE SE
ISSAQUAH WA 98027
88 - Providence Mount St. Vincent

## 2015 Core Plan Statement

### Core Plan Account Balance

| | |
|---|---:|
| Beginning Account Balance as of December 31, 2014 | $7,141 |
| Interest Credited through December 31, 2015 at 2.78% | $198 |
| Ending Account Balance as of January 1, 2016* | $7,479 |
| Percentage Vested (0-4 years of service = 0%, 5 or more years of service = 100%) | 100% |
| **Vested Account Balance as of January 1, 2016** | **$7,479** |

---

*This ending account balance includes any grandfathered or special provision benefits for which you may qualify. As a result, your beginning account balance plus interest may not equal your ending account balance. Likewise, your beginning account balance may not match the ending account balance of last year's statement.

---

To view estimates of your Core Plan benefit or if you have questions about the Providence retirement program, please visit the Road2Retirement (R2R) website at https://road2retirement.org. You may also contact the Retirement Service Center at (866) 776-8727, 8:30 AM to 4:45 PM PT Monday-Thursday and 10:30 AM to 4:45 PM PT Friday.

---

This statement does not represent a promise of benefits or continued employment. It is intended only to inform you of your benefit under the Core Plan. The benefit estimated on this statement will be recalculated based on the Plan provisions in effect at the time your final distribution is processed. If the Plan information and provisions presented here conflict in any way with the official Plan documents, the Plan documents govern. Providence reserves the right to amend, modify, or terminate the Plan at any time.

Love    2016    makes    2.06 %  ✓

2015           i      1.20 % ✓

2014                  2.78 %

2013                  2.55 %

2012                  2.70 %

2011                  4.00 %

2010                  2.18 % →

Δ  (2009)  ⌐ retroactive   1.00 % →

2008:                 0.00 %


0      1      2      3      4      5      6      7

2009   2010   11    12    13    14    15    16

**PROVIDENCE HEALTH & SERVICES**

Notes to Consolidated Financial Statements

December 31, 2007 and 2006

**(7) Retirement Plans**

The Health System has a noncontributory cash balance plan covering substantially all employees called the Providence Health System Cash Balance Retirement Plan (the Cash Balance Plan). The plan benefits are based on defined average compensation and years of service. The vesting period is five years. The Health System's funding policy is based on the actuarially determined cost method, and includes normal service cost and prior service costs amortized over a 20-year period. The Cash Balance Plan meets the definition of a defined benefit plan under SFAS No. 87 (SFAS 87), *Employers' Accounting for Pensions*. Under the Cash Balance Plan, each employee carries an individual account balance. The Health System makes a defined, annual contribution and provides a defined interest credit to each employee's account.

The Health System also has a defined benefit plan called the Providence Services Pension Plan (the PSP Plan). Effective on January 1, 2007, the Cash Balance Plan was amended. As of this date, the PSP Plan was merged into the Cash Balance Plan and was renamed the Providence Health & Services Cash Balance Retirement Plan. Certain plan benefits were modified at that time which primarily impact new entrants into the plan after December 31, 2007.

The Health System also sponsors the Providence Health & Services Matching Plan (the Matching Plan). The plan is a money purchase pension plan, which provides for the Health System to make matching contributions to the plan based on employee contributions to the Providence Health & Services Tax Deferred Annuity Plan. The Matching Plan contribution vesting period is five years.

The Health System's contributions to these pension plans for the years ended December 31, 2007 and 2006 were $117,800,000 and $85,976,000, respectively.

As discussed in note 2, effective December 31, 2007, the Health System adopted SFAS 158. SFAS 158 requires companies to recognize the funded status of defined benefit pension and other postretirement plans as a net asset or liability on its balance sheet. The adoption of SFAS 158 caused a reduction in assets of $21,362,000 and an increase in liabilities of $74,942,000, for a total reduction in net assets of $96,304,000. All future adjustments to the funded status of the plan will be recognized as increases or decreases to net assets in the corresponding accounting period.

# RETIREMENT PLANS COMMITTEE TO THE BOARD OF DIRECTORS
## RiverPlace Hotel - Portland, Oregon
## December 7, 2009

Present: Paul Redmond (C), Lucille Dean SP, Gerry Leahy, Jim Roberts, MD, Ellen Wolf, Kay Stepp (Ex-officio)
Staff: Jan Jones, Cindra Syverson, Tom McDonagh, Jim Larrick, Donna Burke
Guests: Anita Butler, SP

| AGENDA TOPIC | SUMMARY/DISCUSSION | DECISION/FOLLOW UP |
|---|---|---|
| Call to Order | Committee Chair Paul Redmond called the meeting to order at 10:50 a.m. | |
| Consent Calendar | ▪ September 13, 2009 Retirement Plans Committee Minutes<br><br>▪ Plan Director's Report - The Plan Director's Report was reviewed by the Committee. The Report provided brief summaries on funding and disbursements, as well as legislative and administrative updates for the third quarter of 2009. | ▪ The September 13, 2009 Retirement Plans Committee minutes were approved as submitted. |
| Retirement Transition Updates | ▪ **Communication**<br>Tom McDonagh informed the Committee that they continue to have weekly meetings. They have created 30 separate articles for ministries, held over 750 employee meetings, and talked with 30,000 employees without incident. Everything will be up and running on the retirement sites by January 4th. 44,000 employees have actually used the comparison tool out of 50,000.<br><br>▪ **Labor/Employee Relations**<br>Tom McDonagh informed the Committee that the Oregon Nurses Association (ONA) and Oregon Federation of Nurses (OFN) held special retirement meetings before voting. More discussion and information was presented by Sharon Toncray during the Human Resources Committee meeting.<br><br>▪ **Retirement Plans Investment Subcommittee (RPIS) Report**<br>Sr. Anita Butler and Tom McDonagh reviewed the 2009 Q3 RPIS Report, with emphasis on the following: (1) Willamette Falls transition and new Whitman 403(b) and 457(b) plans' (2) Independent fee review underway – focusing on former PS 403(b) plans; (3) Reduction in the number of investment funds; and (4) Status on the replacement for the Principal Stable Value Fund. | |

| Topic | Discussion | Action |
|---|---|---|
| | Sr. Anita informed the Committee that she will be resigning as a member of the Trustees and the Retirement Plans Investment Subcommittee as of June 30-2010. Sr. Anita will be serving as a member of the Providence Ministries Sponsors.<br><br>■ Trustee Report<br>Sr. Anita Butler and Tom McDonagh reviewed the 2009 Q3 Trustee Report, highlighting the areas of Trustees' focus:<br>– Reviewed and discussed management's instruction to change earnings assumption of portfolio from 8% to 7%, and have modified their approach for this year's asset allocation analysis<br>– Conducted regular manager updates<br>– Manager performance reports emailed to Trustees monthly (standardized monthly report created)<br>Committee members would like the opportunity to meet the Trustees and requested bios on Sandy Sanders, Kevin Kelly and Douglas McIntyre - rotating a different Trustee at each meeting possibly beginning in September. The Trustees will not be adding a new member to replace Sr. Anita. | |
| **Annual Committee Review** | The Committee reviewed the recommended changes to the 2010 Committee Goals and Work Plan and the Charter.<br><br>It was noted that the 2009 Committee Self-Evaluation survey will be sent to Committee members to complete and return for review during the March meeting. | The Retirement Plans Committee approved the 2010 Committee Goals and Work Plan and approved the motion to recommend approval of the 2010 Committee Charter to the Board of Directors. |
| **Funding Recommendations for Retirement Plans** | Tom McDonagh provided the Committee with a summary on the Retirement Plan Cost Estimates provided to Finance (CFO) for 2010. | |
| **Plan Amendments and Restatements** | ■ Core Plan (Cash Balance Retirement Plan) – Adds clarifying language on interest rate that will apply under the Plan for 2010 and subsequent years, Rule of 85, and employee eligibility.<br>■ 401(a) Service Plan (Matching Plan) – Renames the Plan, clarifies when non-vested accounts are forfeited and restored, complies with certain provisions of the Pension Protection Act of 2006 and credits prior service for Willamette Falls Hospital participants for purposes of vesting and benefits. | The Retirement Plans Committee approved the motion to recommend approval to the Board of Directors the following Plan Amendments and Restatements: Core Plan, 401(a) Service Plan, 403(b) Value Plan, Tarzana 403(b) Plan Third Amendment, 457(b) Plan third |

- **403(b) Value Plan** – Renames Plan and makes certain administrative and clarifying changes in connection with Tarzana and Willamette Falls Hospital acquisitions, PSEW-N Tax Deferred Annuity Plan, and language to comply with certain provisions Pension Protection Act of 2006.

- **Tarzana 403(b) Plan Third Amendment** – Names Plan and adds certain legal provisions to comply with the Pension Protection Act of 2006, and provides for the participation of certain employees of Willamette Falls Hospital.

- **457(b) Plan Third Amendment** – Adds clarifying changes with regards to a participant's beneficiary and legal changes to comply with State of Washington laws.

- **Whitman Hospital 403(b) Plan** – New Plan established to ensure that Whitman employees will continue to receive the same benefits they would have if they had continued participation in the providence plans.

- **Whitman Hospital 457(b) Plan** – New Plan established to ensure that Whitman employees will continue to receive the same benefits they would have if they had continued participation in the Providence plans.

- **SERP I (Supplemental Executive Retirement Plan)** – Amended to freeze future benefit accruals for periods after 12/31/09 and eliminates the Social Security bridge benefit for periods after that date, and adds other clarifying and administrative changes.

- **SERP II (Supplemental Executive Retirement Plan)** – Amended to freeze future benefit accruals for periods after 12/31/09 and eliminates the Social Security bridge benefit for periods after that date, and adds other clarifying and administrative changes.

- **DC SERP (Defined Contribution Supplemental Executive Retirement Plan** – Replaces SERP I and SERP II Plans which were frozen effective 12/31/09, defines eligibility, and allows participants to select the manner in which their accounts will be deemed to be invested from investment alternatives selected by Providence.

- **Cash Balance Restoration Plan (CBRP)** – Amended to freeze future Pay Credit accruals for periods after 12/31/09, clarifies Monthly Interest Credits, provides participants who are totally and permanently disabled on 12/31/09 to continue to accrue benefits under the Plan, and includes other legal and administrative changes.

Amendment, Whitman Hospital 403(b) Plan, Whitman Hospital 457(b) Plan, SERP I, SERP II, DC SERP, Cash Balance Restoration Plan, and the DC Restoration Plan.

3

| | |
|---|---|
| | • DC Restoration Plan (Defined Contribution Restoration Plan) – Replaces the PH&S Cash Balance Restoration Plan which was frozen effective 12/31/09, defined eligibility and employer contributions, and allows participants to select the manner in which their accounts will be deemed to be invested from investment alternatives selected by Providence. |
| Adjourn | The Retirement Plans Committee adjourned at 11:50 a.m. |

Respectfully submitted by: Donna Burke          **Date:** December 7, 2009

4

# RETIREMENT PLANS COMMITTEE TO THE BOARD OF DIRECTORS
## Davenport Hotel - Spokane, Washington
### September 13, 2009

Present: Paul Redmond (C), Gerry Leahy, Jim Roberts, MD, Ellen Wolf
Excused: Kay Stepp (Ex-Officio), Lucille Dean, SP
Staff: Jan Jones, Cindra Syverson, Tom McDonagh, Jim Larrick, Donna Burke

| AGENDA TOPIC | SUMMARY/DISCUSSION | DECISION/FOLLOW UP |
|---|---|---|
| **Welcome and Opening of Meeting** | Committee Chair Paul Redmond called the meeting to order at 2:55 pm. | |
| **Consent Calendar** | • June 15, 2009 Retirement Plans Committee Minutes<br>• Plan Director's Report - The Plan Director's Report was reviewed by the Committee. The Report provided brief summaries on funding and disbursements, as well as legislative and administrative updates for the second quarter of 2009. | • The June 15, 2009 Retirement Plans Committee minutes were approved as submitted. |
| **Retirement Transition Updates** | • **Communication**<br>Tom McDonagh provided the Committee with an online demonstration of the HR Retirement Website.<br><br>• **Labor/Employee Relations**<br>Tom McDonagh informed the Committee that we are making good progress as implementation talks continue across all ministries. Regions continue to move forward in supporting their local labor negotiation implementation strategies, taking into account their local labor markets. There are significant other total rewards matters on the table in several negotiations, wages and benefits in addition to the retirement plan changes adding to the complexity of those talks.<br><br>• **Retirement Plans Investment Subcommittee (RPIS) Report**<br>Tom McDonagh reviewed the 2009 Q2 RPIS Report. Tom also reviewed the projects underway which included: (1) an independent fee review – focusing on former PS 403(b) plans; (2) working on reducing the number of investment funds, and stable value fund replacement which include ongoing discussions with insurance carriers and Fidelity on transparent and viable options for the PH&S Savings Plans effective January 1, 2010. Tom also noted that he will have an update for the Committee in December on the status for the replacement for the Principal Stable Value Fund. He also reviewed the final fund listing and mapping for the Defined Contribution Plan Fidelity Funds. | |

| Plan Amendments | |  |
|---|---|---|
| | • **Trustee Report**<br>Tom McDonagh reviewed the 2009 Q2 Trustee Report, highlighting recent Trustees actions and decisions. In addition, he reviewed PIMCO's new TALF investment product. A $15 million allocation to this product was made during Q2; however, PIMCO could only accept $9 million. Performance has been strong since purchased as a High Yield Bond equivalent. Tom also gave an update to the Committee on the Trust's current overall asset allocation, and work that is underway to reallocate the assets to a slightly more conservative portfolio.<br><br>Quarterly reviews of all investment managers continue through regular phone calls between Rogerscasey (investment consultant), Tom and the investment managers. | |
| | • **Fund Watch List**<br>Tom McDonagh reviewed the Fund Watch List which was requested by the Committee at the September meeting. He walked the Committee through the Fund Monitoring Scorecard, how a fund gets placed on the Watch List and when it is removed. | |
| | • The following three Plans (Restatements) were presented to the Committee at the June meeting. Additional administrative and clarifying changes have been made to each Plan and final documents will be presented to the Committee in December:<br>　　o Cash Balance Retirement Plan (Core Plan)<br>　　o 403(b) Plan<br>　　o 401(a) Service Plan | • The proposed Restatements of the Cash Balance Retirement Plan (Core Plan), the 403(b) Plan, and the 401(a) Service Plan were approved as submitted. |
| | • **457(b) Second Amendment**<br>Amends the Plan to remove Whitman Hospital as a Participating Entity under the PH&S 457(b) Plan, effective January 1, 2010. The Resolution authorizes the President/CEO and Secretary of PH&S to execute the Amendment and authorizes the System Director, Retirement & HR Operations to take all necessary and appropriate actions to implement the changes. | • The Human Resources Committee approved the motion to recommend approval of the 457(b) Second Amendment to the Board of Directors. |
| | • **SERP I & SERP II**<br>Amendment freezes benefits and participation for periods after | • The Human Resources Committee approved the proposed Amendments/ |

| | |
|---|---|
| | December 31, 2009 and will be replaced with a new defined contribution supplemental executive retirement plan, effective January 1, 2010. Authorizes the System Director, Retirement and HR Operations to take all necessary and appropriate actions to implement the Restatement of the Plans. |
| Restatements of the SERP I, SERP II, Defined Contribution (DC) SERP, Defined Contribution (DC) Restoration Plan, and the Cash Balance Restoration Plan (CBRP). | • Defined Contribution (DC) SERP<br>The Plan is intended as a replacement for SERP I & SERP II Plans, and is intended to provide annual contributions to eligible employees, similar in amount to the annual accrual that the employee would have received under SERP I or II. The Plan also provides for a Social Security bridge of $20,000 per year until age 62, for employees who retire between ages 55 and 62.<br><br>• Defined Contribution (DC) Restoration Plan<br>The Plan is a replacement for the PH&S Cash Balance Restoration Plan (CBRP), which was frozen to additional Pay Credits effective December 31, 2009. The Plan is intended to supplement the retirement benefits of employees whose benefits are limited under the PH&S 401(a) Service Plan because of IRS limits on compensation that can be taken into account under the Service Plan.<br><br>• Cash Balance Restoration Plan (CBRP)<br>The Plan would freeze additional pay credits on January 1, 2010 to change the interest rate to the lesser of CPI + 1% or 4%, consistent with changes made to the Core Plan. Disabled employees will continue to receive pay credits and accrue interest at CPI + 3% under the Plan consistent with their continued accruals in the Core Plan. Participants eligible for the CPI + 3% interest rate in the Core Plan (who satisfy Rule of 85 eligibility by December 31, 2009) remain eligible for that rate in this Plan. |
| Actuarial Valuation | Tom McDonagh reviewed the Executive Summary to the PH&S Cash Balance Retirement Plan as prepared by the plan's Actuary, Milliman, Inc. Tom commented on the following:<br>• Average age and service increased by a small amount over the prior year, to age 45.6 and 10.25 years of vesting service.<br>• Plan asset returns in 2008 were well below the expected rate of 8.00%, with the approximate rate of return equal to -30.9%.<br>• In anticipation of the January 1, 2010 Plan freeze, the liability |

3

| | measurement method was changed because the entry age method is not appropriate for use with a frozen plan. The measurement method change reduced the plan liability by approximately $290 million. |
| :--- | :--- |
| | • Projections for 2010 indicate that if anticipated plan changes are applied to all plan participants effective January 1, 2010, the contribution necessary to amortize the unfunded plan liability at that date over a 10-year period will be $30 million in 2010, increasing at the rate of overall payroll increase each year. |
| Adjourn | The Retirement Plans Committee adjourned at 4:00 pm to Executive Session of the Human Resources Committee. |

**Respectfully submitted by:** Donna Burke          **Date:** September 13, 2009

4

# RETIREMENT PLANS COMMITTEE TO THE BOARD OF DIRECTORS
## System Support Services Office - Renton, Washington
### June 15, 2009

Present:  Paul Redmond (C), Lucille Dean SP, Gerry Leahy, Jim Roberts, MD
Excused:  Kay Stepp (Ex-Officio)
Staff:  Jan Jones, Cindra Syverson, Tom McDonagh, Jim Larrick, Donna Burke
Guests:  Anita Butler SP, Mike Butler

| AGENDA TOPIC | SUMMARY/DISCUSSION | DECISION/FOLLOW UP |
|---|---|---|
| **Welcome and Opening of Meeting** | Committee Chair Paul Redmond called the meeting to order at 8:30 am and Gerry Leahy offered the opening prayer. | |
| **Consent Calendar** | • March 14, 2009 Retirement Plans Committee Minutes<br>• March 14, 2009 Special Joint Retirement Plans Committee/Audit & Compliance Committee Minutes<br>• Plan Director's Report - The Plan Director's Report was reviewed by the Committee. The Report provided brief summaries on funding and disbursements, as well as legislative and administrative updates for the first quarter of 2009. | • The March 14, 2009 Retirement Plans Committee minutes were approved as submitted.<br>• The March 14, 2009 Special Joint Retirement Plans Committee/Audit & Compliance Committee minutes were approved as submitted. |
| **Retirement Transition Update** | Tom McDonagh and Mike Butler informed the Committee that the response from employees has been very positive. From the employees perspective the program change was well thought out and they are very appreciative that it is not being completely eliminating. Average number of retirement calls has increased by about 10-20%, less than originally anticipated. | |
| **Trustee Report** | Mike Butler joined Sr. Anita Butler to review the 2009 Q1 Trustee Report, highlighting recent Trustees actions and decisions. In addition, Sr. Anita and Mike discussed management's request to change the actuarial assumption from 8% to 6%, and modify the approach for this year's asset allocation analysis. Rogerscasey contract has been renegotiated and finalized with a lower price given earnings target change. Also noted was the transition to a lower earnings target and that they will execute the change to minimize fees, expenses for manager reductions, portfolio changes and additional meetings. | |
| **Retirement Plans Investment Subcommittee (RPIS) Report** | Tom McDonagh reviewed the 2009 Q1 Retirement Plans Investment Subcommittee Report. Tom also reviewed the projects underway and the 2009-2010 schedule of activities for the Plan Sponsor Advisors (PSA), their investment consultant. Currently, there are 40 funds on ~~Conference~~ 5/14/09 watch, many of which are being eliminated from the menu or | • The Committee requested education on the funds watch list at a future meeting. |

| | | |
|---|---|---|
| | transitioned to other compliant funds by January 1, 2010. Twenty-nine funds have been removed from watch per RPIS member decision on February 6. The Committee discussed the criteria for screening employee contributions. The Retirement Plans Investment Subcommittee continues to convene meetings as necessary. Tom continues to have regular calls with PSA and Fidelity, and PSA provides regular advice to RPIS. | |
| **Plan Amendments** | • **403(b) Plan Amendment and Restatement** <br> The Amendment renames the PH&S 403(b) Value Plan, converts the Plan to an ERISA Plan, provides for automatic enrollment in the Plan, and makes other administration and clarifying changes. <br> • **401(a) Service Plan Amendment and Restatement** <br> The Amendment would reinstates active participation in the Plan for new employer discretionary contributions, renames the PH&S 401(a) Service Plan, and makes other administrative and clarifying changes. <br> • **Cash Balance Retirement Plan (Core Plan) Amendment and Restatement** <br> The Amendment would freeze certain cash balance pay credits and other grandfathered benefit accruals as of December 31, 2009, changes the annual interest crediting rate on the cash balance account, and incorporates other design and clarifying changes <br> • **Cash Balance Retirement Plan (Core Plan) – Ninth Amendment** <br> The Plan is amended to reverse those provisions that would have modified or eliminated, as of January 1, 2009, certain special transition benefits (Rule of 85, Rule of 75, Rule of 70 and Rule of 60). | • The Retirement Plans Committee approved the Resolutions to authorize the System Director, Retirement and HR Operations of PH&S to take all necessary and appropriate actions on behalf of PH&S to ensure the implementation of the 403(b) Plan, the 401(a) Service Plan, and the Cash Balance Retirement Plan Amendments. <br> • The Retirement Plans Committee approved the motion to recommend approval to the Board of Directors the Resolution to authorize the System Director, Retirement and HR Operations of PH&S to take all necessary and appropriate actions to implement the Ninth Amendment to the Cash Balance Retirement Plan (Core Plan). |
| **Adjourn** | The Retirement Plans Committee adjourned at 9:25 am to the Human Resources Committee Executive Session. | |

**Respectfully submitted by:** Donna Burke     **Date:** June 15, 2009

# RETIREMENT PLANS COMMITTEE TO THE BOARD OF DIRECTORS
## Grand Hyatt – Seattle, Washington
### March 14, 2009

Present: Paul Redmond (C), Lucille Dean SP, Gerry Leahy, Jim Roberts, MD, Kay Stepp (Ex-officio)
Staff: John Koster MD, Jan Jones, Cindra Syverson, Tom McDonagh, Jim Larrick, Donna Burke
Guests: Anita Butler SP

| AGENDA TOPIC | SUMMARY/DISCUSSION | DECISION/FOLLOW UP |
|---|---|---|
| **Welcome and Opening of Meeting** | Committee Chair Paul Redmond called the meeting to order at 4:50 pm. | |
| **Consent Calendar** | • December 8, 2008 Retirement Plans Committee Minutes | • The December 8, 2008 Retirement Plans Committee minutes were approved as submitted. |
| | • Plan Director's Report - The Plan Director's Report was reviewed by the Committee. The Report provided brief summaries on the funding and disbursements for the Core Plan and Value Plan, as well as legislative and administrative updates for the fourth quarter of 2008. | |
| **Retirement Program Design Recommendation** | Tom McDonagh reviewed the Cash Balance Retirement Plan Amendment, and the Supplemental Executive Retirement Plan (SERP Plan) and Cash Balance Restoration Plan (CBRP Plan) Amendments with the Committee. Effective as of December 31, 2009, the proposed amendments would implement new replacement Defined Contribution (DC) Plans for the three referenced plans. The new DC Plan (replacing Core Plan) provides for annual discretionary contributions as set forth in Management's Recommendation. The new DC SERP provides for individually determined contributions, and the DC Restoration Plan will provide existing participants with the same contribution they currently receive under CBRP. | The Retirement Plans Committee unanimously voted to recommend approval of the Cash Balance Retirement Plan Amendment and the Supplemental Executive Retirement Plan and Cash Balance Restoration Plan Amendments to the Board of Directors. |
| | The Retirement Plans Committee met on several occasions to discuss and review the Retirement Program Design Recommendations and most recently at a Special Joint Session with the Audit and Compliance Committee and the full Board of Directors. The amendments further authorize the Vice President, Chief Human Resources Officer and the System Director of Retirement & HR Operations of PH&S to execute the work necessary to implement the recommendations on behalf of PH&S Board of Directors. | |

| Trustee Report | Sr. Anita Butler reviewed the 2008 Q4 Trustee Report, highlighting recent Trustees actions and decisions. In addition, Sr. Anita discussed the process for meeting governance and legal compliance challenges, and investment manager oversight. She informed the Committee on the recently signed contract extension with Rogerscasey due to personnel changes and that the Real Estate change to active management has been placed on hold. | |
| --- | --- | --- |
| Retirement Plans Investment Subcommittee (RPIS) Report | Tom McDonagh reviewed the RPIS Report with the Committee. The Committee also received a Plan Sponsor Advisor's (the investment consultant for Providence Savings Plans) draft report on the PH&S Defined Contribution Plan. Findings will be presented to this Board Committee in June along with the mapping for reducing the overall Mutual Funds currently offered by Providence. Tom noted that there have been numerous meetings as necessary on funds and staying on top of securities. There are 35 funds currently on the watch list. The watch list criteria will be reviewed with the Committee at their June Meeting. | The watch list criteria will be reviewed with the Committee at their June Meeting. |
| Plan Amendments | Tom McDonagh reviewed the following Plan Amendments:<br><br>• **Second Amendment to the PH&S Tarzana 403(b) Plan**<br>Increases the limit on account balances that will be automatically cashed out from $1,000 to $5,000 and provide for automatic distribution to an individual retirement account as of the annuity starting date, if the Participant's account is at least $1,000, but less than $5,000 and the Participant does not make an election for the distribution. The amendment also updates the Plan to comply with final Treasury Regulations under Internal Revenue Code Section 415 and provides that the true-up of the matching contribution will be made annually or more frequently.<br><br>• **Fifth Amendment to the PH&S 403(b) Plan**<br>Amendments mirror the Second Amendment to the PH&S Tarzana 403(b) Plan.<br><br>• **Eighth Amendment to the PH&S Cash Balance Retirement Plan (Core Plan)**<br>Incorporates language requested by the Internal Revenue Service in accordance with the Plan's Favorable Determination Letter request and adds clarifying language. | The Retirement Plans Committee unanimously voted to recommend approval of the Second Amendment to the PH&S Tarzana 403(b) Plan, the Fifth Amendment to the PH&S 403(b) Plan, the Eighth Amendment to the PH&S Cash Balance Retirement Plan, the Third Amendment to the PH&S Matching Plan and the First Amendment of the PH&S Cash Balance Restoration Plan to the Board of Directors. |

| | |
|---|---|
| | • Third Amendment to the PH&S Matching Plan<br>Amendments mirror the Second Amendment to the PH&S Tarzana<br>403(b) Plan.<br>• First Amendment of the PH&S Cash Balance Restoration Plan<br>Primarily technical and clarifying amendments. |
| Adjourn | The Retirement Plans Committee adjourned at 5:20 pm. |

**Respectfully submitted by:** Donna Burke      Date: March 14, 2009